[No. B011716. Second Dist., Div. Six. Dec. 20, 1985.]

CITIZENS TO PRESERVE THE OJAI, Plaintiff and Appellant, v.
COUNTY OF VENTURA et al., Defendants and Respondents;
USA PETROCHEM CORPORATION, Real Party in Interest and
Respondent.

**COUNSEL**

Philip A. Seymour for Plaintiff and Appellant.

James L. McBride, County Counsel, and R. Thomas Harris, Deputy County Counsel, for Defendants and Respondents.

Nordman, Cormany, Hair & Compton and Glen M. Reiser for Real Party in Interest and Respondent.

**OPINION**

ABBE, J.—"Citizens To Preserve The Ojai" (Citizens) appeals from a denial of a petition for writ of mandate. Citizens seek to compel the County of Ventura (County) to set aside its certification of an environmental impact report (EIR) for a project and to vacate the County's approvals of the project on the ground that the EIR failed to analyze the cumulative impact on air quality as required by the California Environmental Quality Act (CEQA)

(Pub. Resources Code, § 21000 et seq.) and the implementing guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq.). The association also seeks to prohibit the parties from carrying out the project until CEQA's requirements are met.

FACTS

The project at issue involved the expansion and modification of an oil refinery at the mouth of the Ojai Valley in Ventura County owned by USA Petrochem Corporation (Petrochem), the real party in interest, for the purpose of processing low grade crude oil. To this end, Petrochem sought modification of two existing conditional use permits.

The County as lead agency determined that the project might have a significant effect on the environment.[1] The County proceeded with preparation of an EIR and performance of an environmental review as required by CEQA. (Pub. Resources Code, § 21151; Cal. Admin. Code, tit. 14, §§ 15064, 15081.)

Early in the environmental review process, the County decided to exclude outer continental shelf emissions from its cumulative air quality impact analysis. The administrative record indicates two reasons for this decision. First, planning staff felt that Petrochem should not bear the cost of a regional multicounty air quality assessment which could cost in excess of $250,000[2] and exceed the statutory time limits for environmental review.[3] Second, an existing cumulative impact analysis of outer continental shelf emissions contained in a 1981 Department of Interior EIS (federal environmental impact statement) for Lease Sale 68 was deemed deficient and its use rejected. The decision to omit outer continental shelf emissions from the cumulative air quality impact analysis was a source of controversy throughout the environmental review process.

The final EIR contained a brief discussion of cumulative air quality impact which concluded the impact was not significant. In making that determination, the report relied entirely upon the March 1982 Ventura County Air

---

[1] The lead agency is the public agency with principal responsibility for carrying out or approving a project which may have a significant effect upon the environment. (Pub. Resources Code, § 21067.)

[2] Apparently, the County unsuccessfully sought grant funding to study outer continental shelf emissions from California Air Resources Board and the California Coastal Commission.

[3] An EIR for a project involving governmental approval or issuance of a permit must be completed and certified within a one year time period. (§§ 21065, 21100.2, 21151.5.)

Quality Management Plan (AQMP), which projected Ventura County's future air quality.[4]

The groundwork for the AQMP was an "emission inventory," which provided a data base regarding sources and quantities of various emissions, including outer continental shelf emissions. (Ventura County Air Quality Management Plan (1982) Final Draft, Adopted by Board of Supervisors of Ventura County, March 23, 1982 (AQMP), p. III-1 et seq.) The AQMP utilized a modeling process known as the empirical kinetic modeling approach to make its forecasts regarding future levels of various pollutants. However, the model did not quantify the potential impact of outer continental shelf emissions on Ventura County's air quality. (See AQMP, p. VII-13.) The AQMP explained that a verified, functional photochemical model for assessing onshore impact of offshore emissions was then unavailable and development of one was not expected for several years. (AQMP, pp. IV-8-IV-9.)

The EIR's cumulative air quality impact analysis notes only parenthetically that the onshore impacts of outer continental shelf development were not included in the modeling analysis performed for the AQMP. (EIR, vol. I, p. 5-111D.) After a brief description of the AQMP, the EIR states: "Based on the AQMP findings, the additional emissions from the expanded Petrochem refinery will not have a significant adverse impact on concentrations of ozone or other pollutants in the Ojai Valley, either by themselves or in concert with emissions from other sources." (EIR, vol. I, pp. 5-111D-5-111E.)

Following a public hearing, the County board of supervisors upheld the certification of the EIR as complete and conditionally approved modification 19 of conditional use permit No. 3393.[5] The County filed a notice of determination on November 29, 1983. (Pub. Resources Code, § 21152; Cal. Admin. Code, tit. 14, § 15094.) A petition for a writ of mandate was filed December 29, 1983. (Pub. Resources Code, § 21167.)

DISCUSSION

The primary issue on appeal is whether the County's EIR adequately addressed the cumulative air quality impacts, even though it relied wholly

---

[4]A primary purpose of the AQMP was to determine the prospects and controls necessary for attaining national ambient air quality standards established under the federal Clean Air Act Amendments (42 U.S.C. § 7401 et seq.) by 1987.

[5]The second conditional use permit sought to be modified was merged with and made a part of conditional use permit No. 3393.

upon an analytical model which did not evaluate the onshore effect of outer continental shelf emissions. No challenge is made to the sufficiency of the analysis of the air quality impacts resulting from the project alone.

■ Abuse of discretion is established if the County did not proceed as required by law, if its determination was not supported by its findings, or its findings were not supported by substantial evidence. (Pub. Resources Code, § 21168; Code Civ. Proc., § 1094.5, subd. (b).) This court ". . . does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. [Citations.]" (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) Certification of an EIR which is legally deficient because it fails to adequately address an issue constitutes a prejudicial abuse of discretion regardless of whether compliance would have resulted in a different outcome. (See *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1022-1023 [192 Cal.Rptr. 325]; cf. also Pub. Resources Code, § 21005 (effective Jan. 1, 1985).)

■ An EIR must identify and evaluate all significant environmental effects of a project. (Pub. Resources Code, § 21100; §§ 21061, 21151.) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) (3) Where the cumulative impacts of a proposed project and other activities are significant, they too must be discussed. (Cal. Admin. Code, tit. 14, §§ 15130, 15126, subd. (e); see *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 406-411 [151 Cal.Rptr. 866].)

" 'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Cal. Admin. Code, tit. 14, § 15355.) "The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Cal. Admin. Code, tit. 14, § 15355, subd. (b).)

■ A discussion of significant cumulative impacts must ". . . reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. . . ." (Cal. Admin. Code, tit. 14, § 15130, subd. (b).) Such a discussion ". . . should be guided by the standards of practicality and reasonableness . . ." but must at a minimum include certain elements.

(Cal. Admin. Code, tit. 14, § 15130, subd. (b).) It must contain (1) either (a) a list of past, present, and reasonably anticipated future projects, including those projects outside the agency's control, which produce related or cumulative impacts or (b) a summary of such projections contained in an adopted general plan or related planning document which evaluates regional or areawide conditions, (2) a summary of environmental effects expected to be produced by those projects, and (3) a reasonable analysis of the cumulative effects of the relevant projects and the options for mitigating or avoiding each of the significant cumulative effects. (Cal. Admin. Code, tit. 14, § 15130.)

■ An EIR need not contain a full-blown cumulative impacts discussion if the impacts are found to be insignificant. Where a particular effect is found insignificant, an EIR must briefly indicate the reasons for determining that the effect is not significant and therefore not discussing it in detail. (See Pub. Resources Code, §§ 21061, 21100, 21151; Cal. Admin. Code, tit. 14, § 15128.)

■ In determining whether the EIR's discussion of cumulative air quality impacts fails to meet the requirements of CEQA and the implementing guidelines, we recognize ". . . that the 'sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible' and that perfection is not required. [Citations.]" (*Whitman* v. *Board of Supervisors, supra,* 88 Cal.App.3d 397, 411.) "On the other hand, the courts have favored specificity and use of detail in EIRs since ' "[a] conclusory statement 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' not only fails to crystallize the issues [citation] but 'affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.' [Citation.]" ' [Citations.]" (*Ibid.*)

■ "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Cal. Admin. Code, tit. 14, § 15151; *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].) " 'Feasible" means capable of being accomplished in a successful manner within a reasonable period of time, taking into account

economic, environmental, legal, social, and technological factors." (Cal. Admin. Code, tit. 14, § 15364; cf. Pub. Resources Code, § 21061.1.)

■■■ Applying these standards, we find the EIR's discussion of cumulative air quality impacts is inadequate on several fronts. The EIR relies wholly upon the earlier AQMP analysis which admittedly excluded outer continental shelf data from its evaluation. The EIR does not explain in even minimum detail the basis for the omission and provides no reasoned analysis clarifying why complete reliance on AQMP is justified when this major omission exists.[6]

■■■ It can be gleaned from the "Response to Comments" component of the final EIR[7] that the County found the then available photochemical models were not capable of accurately quantifying the onshore impact of offshore emissions. However, this information does not cure the EIR's disclosure deficiencies in its cumulative air quality impact discussion. Although the County was not required to engage in sheer speculation as to future environmental consequences (see *Topanga Beach Renters Assn.* v. *Department of General Services* (1976) 58 Cal.App.3d 188, 196 [129 Cal.Rptr. 739]; *Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851, 854-855 [139 Cal.Rptr. 176]; *Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 351 [194 Cal.Rptr. 203]), the EIR was required to set forth and explain the basis for any conclusion that analysis of the cumulative impact of offshore emissions was wholly infeasible and speculative. (Cal. Admin. Code, tit. 14, § 15145.)[8]

As the environmental impact report now reads, it is misleading in that it completely ignores information contained in the AQMP which suggests that outer continental shelf emissions will affect onshore air quality and thereby

---

[6]There is no argument that activities relating to outer continental shelf petroleum production were not within the scope of a legally sufficient cumulative impact analysis.

[7]As required by CEQA, the County made the draft EIR available for public review and responded to the comments received. (Pub. Resources Code, §§ 21092, 21153; Cal. Admin. Code, tit. 14, §§ 15087, 15088.) A number of comments received expressed concern with the failure to address the cumulative environmental impact of outer continental shelf activities on air quality. (See, e.g., EIR, vol. III, pp. 44, 76, 94-95, 148-149.) The final EIR, those comments and the County's responses thereto. (Cal. Admin. Code, tit. 14, § 15132.)

[8]We note a portion of one of the EIR's technical appendices, a report entitled "Discussion of Modeling Issues Raised in Public Hearings," which was prepared by the consultant hired by the County to perform the air quality impact assessment. It sought to answer the following question: "Why weren't OCS [Outer Continental Shelf] emission sources included in the Cumulative Impact Analysis?" The report stated: "Current models and modeling data bases could be used to estimate the cumulative onshore effects of OCS emission sources together with all land-based sources [citations to studies]. However, such a cumulative impact assessment was not within the scope of our study. . . ." (EIR, vol. II, p. 598.)

downplays the possibility of a serious cumulative impact resulting from those emissions. The AQMP acknowledged that air pollutant emissions in the Santa Barbara channel can potentially affect onshore air quality and it was anticipated that those emissions would contribute to smog levels. It stated that oil exploration and extraction activities in the outer continental shelf area might have a pronounced effect on ozone concentrations in Ventura County and the outer continental shelf emissions were expected to be substantial. It further explained: "If OCS (outer continental shelf) sources were located onshore and considered as a category, the category would be one of the largest categories of NOx (nitrogen oxides) in the county. By 1987 OCS activities are expected to generate approximately fifteen tons of NOx per day. No other category is forecast to generate this much NOx by 1987." One of the few indications in the EIR of these potential cumulative effects was the County's concession in its response to public comment that ". . . OCS [outer continental shelf] impacts of activities through Lease Sale 80 may be substantial." (EIR, vol. III, p. 201.)

 "[I]t is vitally important that an EIR avoid minimizing the cumulative impacts. Rather, it must reflect a conscientious effort to provide public agencies and the general public with adequate and relevant detailed information about them. [Citation.]" (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 79 [198 Cal.Rptr. 634].) A cumulative impact analysis which understates information concerning the severity and significance of cumulative impacts impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval. (See *San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra,* at p. 80.) An inadequate cumulative impact analysis does not demonstrate to an apprehensive citizenry that the governmental decisionmaker has in fact fully analyzed and considered the environmental consequences of its actions. (See Cal. Admin. Code, tit. 2, § 15003; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66].)

 Preparation of an EIR ". . . necessarily involves some degree of forecasting" and ". . . an agency must use its best efforts to find out and disclose all that it reasonably can." (Cal. Admin. Code, tit. 14, § 15144.) "A good faith effort to comply with a statute resulting in the production of information is *not* the same, however, as an absolute failure to comply resulting in the *omission* of relevant information. While the guidelines allow for flexibility of action within their outlines, they are not to be ignored." (*Rural Landowners Assn.* v. *City Council, supra,* 143 Cal.App.3d 1013, 1022.) The requirement for a cumulative impact analysis must be

interpreted so as to afford the fullest protection of the environment within the reasonable scope of the statutory and regulatory language. (See *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; *San Franciscans For Reasonable Growth* v. *City and County of San Francisco, supra,* 151 Cal.App.3d at p. 81.)

 Consequently, assuming a sophisticated technical analysis was not feasible, if some reasonable, albeit less exacting, analysis of the onshore impact of outer continental emissions could be performed, the County was required to do so and report the results. Furthermore, if a less exacting analysis yielded facts indicating the cumulative impact of outer continental shelf emissions was not significant, the EIR was required to at least briefly state and explain such conclusion. (Pub. Resources Code, §§ 21061, 21100, 21151; Cal. Admin. Code, tit. 14, § 15128.)

Accordingly, the judgment is reversed and the cause remanded with directions to the trial court as follows:

1. To issue a writ of mandate directing respondent to void its certification of the final EIR and approval of modification No. 19 of conditional use permit No. 3393.

2. To issue an order enjoining respondent and real party in interest from approving or carrying out the project until an EIR adequately addressing the cumulative air quality impacts had been prepared and all other CEQA prerequisites satisfied.

Stone, P. J., and Gilbert, J., concurred.

A petition for a rehearing was denied January 17, 1986, and the petition of all respondents for review by the Supreme Court was denied March 27, 1986.