[No. H000445. Sixth Dist. Apr. 15, 1988.]

RONALD LAUPHEIMER et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents;
COUNTY OF SANTA CRUZ, Intervener and Appellant.

## COUNSEL

Douglas B. Allen, Francisca A. Burnett and Burnett, Burnett & Allen for Plaintiffs and Appellants.

Dwight L. Herr, County Counsel, and Harry A. Oberhelman III, Assistant County Counsel, for Intervener and Appellant.

John K. Van de Kamp, Attorney General, Robert H. Connett, Assistant Attorney General, Clifford T. Lee and Bruce S. Klafter, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**AGLIANO, P. J.**—The California Department of Forestry ("Forestry") approved a landowner's plans to cut and remove trees from owner's property in Santa Cruz County. Area homeowners, joined by the county and a water district, petitioned for a writ of mandate and injunctive relief to prevent the logging. The trial court denied relief. On appeal, we conclude that for want of a showing of adequate consideration of potential cumulative effects upon the environment, Forestry's approval of the second of two "timber harvesting plans" for the property was a prejudicial abuse of discretion. Accordingly we shall reverse the judgment with directions to issue the writ of mandate.

The property consists of 160 acres, located on ridges in the Lompico Creek watershed on the southwesterly slope of the Santa Cruz Mountains. The landowner is an association of business entities (collectively "Coast"), which proposed to log approximately 116 of the 160 acres. The homeowners own parcels downhill from Coast's property. The area has been subject to serious erosional damage in the past.

Coast's proposed logging operation was subject to prior approval by Forestry under the Z'berg-Nejedly Forest Practice Act of 1973 (the Act, Pub. Resources Code, § 4511 et seq.) and administrative regulations (Rules, Cal. Code Regs., tit. 14, § 911 et seq.) thereunder. Coast submitted two timber harvesting plans. The first (Timber Harvesting Plan #5-84-5 SCR, the "5 Plan") related to 45 gently sloping acres, and the second (Timber Harvesting Plan #5-84-28 SCR, the "28 Plan"), submitted a little more than two months later, to 71 acres on steeper terrain. Forestry approved both plans.

This action, begun by the homeowners, was initially directed only to the 5 Plan. Coast, the State of California, and state agencies and officials were joined as defendants. The trial court temporarily restrained logging under the 5 Plan, but provided that Coast could lift the injunction by posting a bond. Coast posted the bond, and then logged the 5 Plan site, several months before this action came to trial.

Approximately a month after the 28 Plan was submitted to Forestry, the homeowners applied in the previously filed action for a temporary restraining order against logging under the 28 Plan. The county and the water district were granted leave to intervene in support of this new application. After a hearing the temporary restraining order was denied, but the First District Court of Appeal issued a stay.

Ultimately the action went to trial. The trial court entered judgment in favor of Coast and the state defendants. The homeowners and the county appeal. Neither the water district nor Coast has taken any part in the appeal; the active respondents are the State of California and its named agencies and officials (collectively "the state"). We denied the homeowners' application for a stay pending appeal, but we are advised Coast has not begun logging under the 28 Plan.

Several of the issues contested in the trial court have not been argued to this court. On appeal, the homeowners and the county contend in pertinent part that approval of the two timber harvesting plans was invalid for reasons that fall into three categories: (1) Because the Act and Rules violate the federal and California Constitutions.

(2) Because the Act and Rules violate the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.).

(3) Because in processing the plans Forestry made an insufficient analysis of "cumulative impacts" under CEQA and administrative regulations thereunder (Guidelines, Cal. Code Regs., tit. 14, § 15000 et seq.).

Appellants do not appear to argue Forestry failed to comply with the Act and Rules themselves. Nor do appellants document assertions that they, or any of them, were in fact denied adequate notice or an adequate opportunity to participate. Finally, appellants identify no actual or inevitable harm to them, or any of them, inherent in either of the plans.

## I. *Constitutional issues.*

Appellants argue that the Act and Rules, as written, deny both procedural due process of law and equal protection of the laws.

The Act embodies legislative declarations of an intent to maintain "maximum sustained production of high-quality timber products" while at the same time "giving consideration" to the public interest in watershed protection, fisheries and wildlife, range and forage, recreation, and aesthetic enjoyment. (Pub. Resources Code, §§ 4512, 4513.) It entrusts primary regulatory responsibility to Forestry, in consultation with agencies with relevant expertise.

Under the Act timber operations shall not be conducted until a timber harvesting plan, prepared by a registered professional forester, has been submitted to Forestry. (Pub. Resources Code, § 4581.) The timber harvesting plan is to describe the work and to list, among other things methods to be used to control erosion and "[s]pecial provisions, if any, to protect any unique area within the area of timber operations." (*Id.*, § 4582, subd. (f).) Forestry is to give notice of the timber harvesting plan to the public, as well as to interested persons and specified agencies, conduct an inspection of the area to be logged unless it determines that inspection is not necessary, and determine whether the plan is in conformance with applicable rules and regulations within a specified relatively short period after filing or inspection unless the time is extended by agreement. (*Id.*, §§ 4582.4, 4582.6, 4604, 4582.7.) The Act provides for analysis of the timber harvesting plan by a "review team" of representatives of relevant agencies and political subdivisions, and (in certain cases) for public hearings. If Forestry determines that the timber harvesting plan does not conform to the rules and regulations it shall so notify the applicant and timber operations shall not begin. (*Id.*, § 4582.7.) If Forestry finds the timber harvesting plan to be in conformance (and thus in necessary effect approves it), or if it takes no action within the specified time, logging may begin. (*Ibid.*)

The Rules "shall be the only criteria employed by the director [of Forestry] when reviewing timber harvesting plans pursuant to Section 4582.7." (*Id.*, § 4582.75.)

a. *Due process.*

■ "Due process principles require reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest" by an adjudicative decision such as that made by Forestry with respect to these plans. (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 612-613 [156 Cal.Rptr. 718, 596 P.2d 1134].)

■ We need not reach the state's contention that the county, as such, lacks standing to raise these constitutional issues. Patently the homeowners, as coappellants, have standing; thus the issues are properly before us. We shall treat the county's arguments as incorporated in the homeowners' position.

1. *Significant deprivation.*

■ Both federal and California Constitutions provide that the state may not deprive any person of property without due process of law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) A typical judicial statement is that procedural due process guarantees apply to "governmental deprivation of a *significant* property interest." (*Horn* v. *County of Ventura, supra,* 24 Cal.3d 605, 612, italics added; also see p. 616.)

The significance of the homeowners' property *interests* cannot be questioned. Whether approval of Coast's timber harvesting plans was likely to effect a significant *deprivation* of those property interests is problematic. As their proof developed at administrative hearings and at trial, the homeowners and their copetitioners focused on an assertion that the proposed logging, in the context of other projects and existing conditions in the Lompico Creek watershed, would increase the risk of erosion and landsliding, and thus of injury to physical property and to public and private water supplies, in a future storm. Their expert witness, Curry, testified at trial that in his opinion the proposed logging under the 28 Plan, when considered with the logging already completed under the 5 Plan and other existing conditions, would give rise to a 50 percent probability that a future storm with the intensity of one normally expected to occur once in 10 to 20 years would have the same impact in terms of sediment yield as a 100-year storm could otherwise be expected to have. In response a U.S. Forest Service hydrologist, called by the state, testified that in his opinion Curry's estimate of the impact of the logging on sedimentation was too high.

The trial court concluded that projected impacts "are entirely speculative and remote." Nevertheless the trial court appears to have assumed, for purposes of further analysis, that the prospect of deprivation was significant

enough to give these homeowners a right to notice and an opportunity to be heard. We shall accept the trial court's assumption.

### 2. *Notice.*

■ " 'The fundamental requisite of due process of law is the opportunity to be heard.' [Citation.] This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." What is required is "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature as reasonably to convey the required information [citation], and it must afford a reasonable time for those interested to make their appearance [citations]. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied." (*Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314-315 [94 L.Ed. 865, 873, 70 S.Ct. 652].)

■ The appellants argue the Act and Rules are invalid because on their faces they do not provide notice adequate to afford procedural due process.

Normally, a litigant who challenges a legislative enactment itself on procedural due process grounds has been able to demonstrate either that he or she was in fact denied due process (see, e.g., *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 541-543 [96 Cal.Rptr. 709, 488 P.2d 13]) or that he or she has standing, as a taxpayer (see, e.g., *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-270 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]) or otherwise, to seek what amounts to a declaration of unconstitutionality for application to future disputes. We question whether these appellants would qualify to maintain this attack on either basis. Nevertheless we shall consider the merits.

At times relevant to these plans, the Act and Rules provided for an elaborate scheme of notices.

When a "plan submitter" submitted a timber harvesting plan in Santa Cruz County, he or she was required to submit as well a "Notice of Intent to Harvest Timber" (Notice of Intent), together with a list of owners of property (1) fronting or bordering the haul route between the plan area and the nearest public road or (2) within 300 feet of the property to be logged. Before he or she submitted the plan, the plan submitter was required to mail copies of the Notice of Intent to all listed property owners as well as to several local officials. The plan submitter was required to publish the Notice

of Intent in a newspaper of general circulation in the area, and to post a copy of the Notice of Intent "at a conspicuous location that is easily visible to the public and near the plan site." (Rules, §§ 926.3, 1032.7.) Forestry was required to distribute copies of the Notice of Intent to the county clerk and to the local Ranger Unit headquarters for posting. (Rules, § 1032.8.)

Each Forestry regional office was required to maintain a list of timber harvesting plans submitted each day and to provide free copies of the list to any person who requested it. (Rules, § 1032.9.)

Upon receipt of a timber harvesting plan, Forestry was required to maintain a copy available for public inspection and to transmit copies to various state agencies and to the county planning agency (Pub. Resources Code, § 4582.6) and to send a copy of the plan to the affected county "no later than two . . . days from the date the Department receives the plan." (Rules, § 1115.)

Upon filing the plan (within 10 days of submission: Rules, § 1037) Forestry was required to prepare a Notice of Filing, and to transmit copies of the notice to the plan submitter, to the county clerk and local Ranger Unit headquarters for posting, and to specified public agencies. (Rules, § 1037.1.) Notice of Filing was also to be given to "any person who requests, in writing, such notification." (Pub. Resources Code, § 4582.4.)

Forestry was also required to transmit a copy of the timber harvesting plan to "any person who has made a written request therefor," at that person's cost, and "shall invite written comments, and will consider these comments." (Rules, § 1037.3.)

Within the 10-day period after initial submission Forestry was also required to determine whether a "preharvest inspection" of the plan site would be necessary. (Rules, § 1037; cf. Pub. Resources Code, § 4604.) At the time the 28 Plan was being processed, Forestry was given 15 days from date of initial inspection or, if no inspection was found necessary, 15 days from the date of filing in which to determine whether the plan was in conformance with the Act and Rules. (Pub. Resources Code, § 4582.7; Rules, § 1037.4.)

In the circumstances of record the county was entitled to demand a public hearing as to both the 5 Plan and the 28 Plan prior to Forestry approval or disapproval. (Pub. Resources Code, § 4582.6, subd. (b); Rules, § 1115.) Pursuant to the county's standing request, public hearings were held on both plans. The Rules required that Forestry give public notice of the hearing "by the best practicable means." (Rules, § 1115.2.) The Rules

required, "[a]t a minimum," mailing to the requesting entity, notice to "other interested parties" (including any additional parties named by the county) in the manner applicable to a Notice of Intent, and "sending a copy of the notice to a newspaper of general circulation in the area." (*Ibid.*)

The Rules also provided for notice of Forestry's determination whether the timber harvesting plan did or did not conform to the Act and Rules. (Rules, §§ 1037.6-1037.9.) If the timber harvesting plan was found not to conform, "timber operations shall not commence" and the plan submitter could request a public hearing before the Board of Forestry (Pub. Resources Code, § 4582.7; Rules, §§ 1053-1055.4, 1056-1059) subject to detailed notice requirements (Rules, § 1056.2).

Appellants assert this regulatory scheme failed in five respects to provide constitutionally adequate notice.

A. *Content of Notice of Intent.*

■ Appellants first complain that the Act and Rules did not require the Notice of Intent to state (1) that written comments would be accepted by Forestry, (2) that a copy of the timber harvesting plan was "lodged for inspection" within the affected county, and (3) that the county supervisors could request a public hearing.

The due process standard is not so rigid as to require notice of such procedural details so long as the specified notice is (in *Mullane's* words) "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (339 U.S. at p. 314 [94 L.Ed. at p. 873].) The Notice of Intent described in the Rules was constitutionally sufficient.

B. *Distribution of notices.*

■ The homeowners complain there was no requirement for notice to downstream water users (more than 300 feet from the property to be logged) who (in the homeowners' view) are "those persons whose interests are most likely to be affected . . . ." Relying primarily on *Horn* v. *County of Ventura, supra,* the homeowners suggest the distribution requirements of the law were "extremely limited" and "haphazard."

We disagree with this characterization of the detailed and systematic notice requirements of the Rules, and with the implication that plan submitters, or Forestry, should be constitutionally obliged to find and serve notices on all possible "downstream water users." The Rules contemplated

distribution of notice "[a]t such other locations as the Director [of Forestry] may deem desirable and feasible to provide adequate public notice." (Rules, §§ 1032.8(c), 1037.1(b).) Had Forestry in fact failed, or countenanced a failure, to provide notice adequate to the circumstances of record here, appellants could and should have so argued. They have not done so.

### C. *Processing time.*

■ Appellants argue the times prescribed by the Act and Rules for review of timber harvesting plans were "unrealistically short." Appellants suggest the availability of reasonable alternatives, such as more deliberate consideration during the winter logging moratorium.

*Mullane* points out that the reasonable-time requirement, among others, need only be "reasonably met" with "due regard for the practicalities and peculiarities of the case." (339 U.S. at pp. 314-315 [94 L.Ed. at 873].) The minimum processing time of 25 days—10 for prefiling consideration and 15 after filing—was not facially invalid, given the timber owner's legitimate interest in harvesting his or her crop without undue delay. In this court appellants have not contended they were *in fact* denied adequate time to prepare for hearings.

### D. *Review team recommendations.*

■ Forestry was required to establish "[i]nterdisciplinary review teams" of representatives of specified public agencies (to include "a representative of county government when the county government so requests") "to review plans and assist the Director in the evaluation of proposed timber operations and their impacts on the environment." (Rules, § 1037.5; also see § 1037.4.) The review team was expected to review the timber harvesting plan, meet, and develop recommendations to Forestry. The review team meeting was to be open to the plan preparer, the landowner and timber owner, "and, insofar as possible without disrupting the work of the team, to the public." (*Id.*, § 1037.5, subd. (d).)

Appellants point out the review team meeting for the 28 Plan occurred the day before the public hearing and the review team's report was not available until 10 days after the public hearing. Appellants do not suggest specific prejudice to them. Instead appellants argue in abstract terms that the timber harvesting plan procedure should be altered "to require the review team report to be available prior to the public hearing," so as to "permit members of the public to comment on the conclusions of the multidisciplinary review team."

Appellants' premise appears to be that the general public has a due-process right to notice of, and thus to participate in, the timber harvesting plan review process. The premise is flawed: The Constitutions guarantee due process only to persons threatened with deprivation of significant property interests. (Cf. *Horn* v. *County of Ventura, supra,* 24 Cal.3d 605, 612, 616.) We are aware that an opinion of one Court of Appeal, filed eight years before *Horn* and relevant to an earlier timber-harvesting statute, might be read to imply a procedural due process right in the public generally with respect to environmental matters. (*Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 14 [97 Cal.Rptr. 431].) We respectfully conclude the constitutional due process clauses cannot be so broadly construed.

### E. *Major issue statement.*

■ The Act required Forestry to "prepare and make available written responses to significant issues raised at the [public] hearing." (Pub. Resources Code, § 4582.6, subd. (b); cf. Rules, § 1115.3.) The Rules further required that Forestry's notice of conformance include "a written response . . . to significant environmental points raised during the evaluation process." (Rules, § 1037.8).

A so-called "major issue statement" was prepared for each of the two plans. Appellants point out that the statement for the 28 Plan was not made available until one day after the plan was approved, and argue (implicitly relying on the due process clauses) that "[t]he public should be entitled to review the major issue statement prior to [Forestry's] final decision."

Again appellants raise only the purely legal question whether the Act and Rules, as written, afford due process.

The Act made no provision for the timing of Forestry comments on "significant issues raised." The Rules contained two such provisions. "[A] written response of the Director to significant environmental points raised *during the evaluation process"* must be included in a notice of conformance to be transmitted "[w]ithin 10 working days of the date a plan is found in conformance . . . ." (Rules, 1037.8 (italics added).) "Written responses to significant issues raised *at the public hearing* shall be prepared by the [Forestry] employee responsible for approval or disapproval of the plan and shall be made available to the public and to Review Team members before the final approval or disapproval of the plan." (Rules, 1115.3 (italics added).)

Thus the Act and Rules contained provision for the specific notice appellants seek. Had appellants been able to show prejudice by virtue of Forest-

ry's apparent failure to abide by Rules 1115.3 they might have attacked the approval of the 28 Plan on that ground. They have made no attempt to do so.

### 3. *Hearing.*

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' [Citations.]" (*Mathews* v. *Eldridge* (1976) 424 U. S. 319, 333 [47 L.Ed.2d 18, 32, 96 S.Ct. 893].)

Appellants contend the Act and Rules contain inadequate provision for hearing. They assert they were entitled to a "predeprivation" hearing *before* approval of a timber harvesting plan. They point out that in the circumstances of record here only the county can demand a predeprivation hearing (Pub. Resources Code, § 4582.6, subd. (b)) and that the only other mandatory hearing provision is in the nature of an appeal, available only to a plan submitter and only *after* his or her timber harvesting plan has been disapproved (Pub. Resources Code, § 4582.7). Once again appellants attack the Act and Rules facially, contending, not that the steps actually taken in the process of approving these plans were defective, but rather that the approval should be set aside because the statute and rules are invalid as written.

We conclude a due process right to a hearing cannot be assessed in the abstract. " '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' . . . [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [Citation.]" (*Mathews* v. *Eldridge, supra,* 424 U.S. 319, 334-335 [47 L.Ed.2d 18, 33].)

A directly affected member of the public might well be able, in the circumstances of a given case, to demonstrate that he or she had been denied procedural due process notwithstanding full compliance with all applicable statutes and regulations. *Horn* was such a case, and we do not quarrel with *Horn's* conclusion that the prospect of "a substantial or significant deprivation of the property rights of other landowners" would entitle such landowners to an opportunity for a predeprivation hearing as a

matter of constitutional right. (*Horn* v. *County of Ventura, supra,* 24 Cal.3d at p. 616.)

We conclude only that the Act and Rules establish procedures which are adequate, as a matter of procedural due process, *in the abstract context in which appellants have chosen to attack them.* It is apparent to us that Forestry has as a practical matter the power to convene a public hearing, on adequate notice to all apparently affected persons, whenever appropriate.

b. *Equal protection.*

 Appellants argue that because the Act granted no administrative appeal to any party other than an unsuccessful plan submitter (Pub. Resources Code, § 4582.7), it denied equal protection of the law to local public entities and to individual members of the public.

 The essence of equal protection is that the state may not discriminate, in the bestowal or denial of rights, as between similarly situated persons or classes of persons. "To ask whether two groups are similarly situated in this context . . . is the same as asking whether the distinction between them can be justified under the appropriate test of equal protection." (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 798 fn. 19 [187 Cal.Rptr. 398, 654 P.2d 168].) In this case the appropriate test is whether the challenged distinction bears " 'a rational relationship to a conceivable legitimate state purpose . . . .' " (*Id.,* at p. 799.)

Patently it does. On the face of the Act and Rules, no individual member of the public and no local public entity can be deemed to have an interest in the question whether a landowner may harvest his or her own trees comparable to that of the landowner himself or herself. The legislative decision not to grant such administrative appeal rights to such persons and entities was rationally related to the legitimate state purpose of administrative efficiency.

We conclude the Act and Rules did not deny equal protection to the classes of whom these appellants are members.

II. *Conformity of the Act and Rules to CEQA.*

 The appellants' second major contention is that the Act and Rules do not conform to CEQA.

CEQA is California's comprehensive environmental-protection statute. CEQA provides that a public agency that proposes to "carry out or ap-

prove" a "project," as defined, shall determine whether the project will have "a significant effect on the environment" (Pub. Resources Code, §§ 21080, subd. (c), 21082.2) and (if so) shall fully inform itself and the general public of all relevant environmental considerations by means of an environmental impact report (EIR) (*id.*, §§ 21100, 21151). If the EIR identifies "one or more significant effects," the public agency may not approve or carry out the project unless it has made one or more of three specified findings with respect to measures to mitigate the effects. (*Id.*, § 21081.) CEQA gives private citizens and citizens' groups an active role, expressly recognizing citizens' "responsibility to contribute to the preservation and enhancement of the environment." (*Id.*, § 21000, subd. (e); cf. *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935-936 [231 Cal.Rptr. 748, 727 P.2d 1029].)

On its face CEQA would apply to Forestry's approval of timber harvesting plans. But CEQA further provides that written documentation prepared for a state agency pursuant to another regulatory program may be submitted in lieu of an EIR if the regulatory program has been certified by the Secretary of the Resources Agency. (Pub. Resources Code, § 21080.5, subds. (a), (c).) The Act timber harvesting plan procedures were so certified in January 1976 and recertified in 1979.

Appellants contend (1) the Act and Rules do not conform to applicable CEQA notice requirements, and (2) certification of the timber harvesting plan procedure under CEQA has expired.

### a. *CEQA notice requirements.*

In subdivision (d) of section 21080.5, CEQA establishes a variety of criteria for certification of an alternative regulatory program. Appellants contend the Act and Rules, and forms furnished by Forestry, do not satisfy these criteria. Appellants further contend the time provided under the Act and Rules for public review of the timber harvesting plan and review team reports does not conform to the requirement of the Guidelines that a "public review period" of not less than 30 nor more than 90 days be provided for EIRs. (Guidelines, § 15105(a).)

The extension of appellants' argument appears to be that because the Act and Rules do not comply with CEQA the exemption otherwise provided by Public Resources Code section 21080.5 is not available to Forestry, and therefore that Forestry must (but in this matter did not) comply with the EIR requirements of CEQA.

Appellants' facial attack upon certification of the Act and Rules comes far too late. The exemption provided by section 21080.5 depends in the

abstract not upon a finding of compliance at the time a particular project is proposed but rather upon *certification* by the Secretary of the Resources Agency. (Pub. Resources Code, § 21080.5, subds. (a), (c).) The timber harvesting plan procedures were certified in 1976, eight years before the homeowners brought this action; the Secretary of the Resources Agency considered each of the criteria specified by section 21080.5 and expressly found the timber harvesting plan procedures complied with each of them. Section 21080.5 provides that any action to annul a certification shall be brought within 30 days after certification. (Pub. Resources Code, § 21080.5, subd. (h).) Appellants' untimely challenge must be disregarded.

Belatedly the county contends in its reply brief that this action may be regarded not as an attack upon the initial certifications but rather as a contention that "the plan or other written documentation" prepared with respect to *these* timber harvesting plans did not comply with section 21080.5, a contention to which a 30-day limitation from "the date of the filing of notice of the approval or adoption of the activity" would apply. (Cf. Pub. Resources Code, § 21080.5, subd. (g).) We reject this contention for two reasons. First, subdivision (g), on which the county relies, applies only to documentation "prepared pursuant to paragraph (3) of subdivision (d)" of section 21080.5. There is no indication in the record that any appellant had invoked the relatively narrow provisions of paragraph (3). ▇▇ Second, an assertion made for the first time in a reply brief will be disregarded absent a showing of good cause for failure to raise it previously. (Cf. 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 496, pp. 484-485.)

b. *Recertification.*

▇▇ Alternatively appellants argue that "significant changes" in the timber harvesting plan procedures since certification mandate resubmittal of the procedures for a determination by the Secretary of the Resources Agency whether the procedures should be recertified. The only such change appellants expressly identify is "the amendment of Section 4582.6 . . . , by which the State preempted local regulation of timber harvesting." Again the thrust of their argument appears to be that because recertification has not been sought Forestry can no longer claim an exemption from CEQA under section 21080.5.

On the face of subdivision (f) of section 21080.5, resubmittal is discretionary: "After a regulatory program has been certified pursuant to this section, any proposed change in the program which could affect compliance with the qualifications for certification specified in subdivision (d) may be submitted to the Secretary of the Resources Agency for review and comment." Upon resubmittal the secretary is to determine "whether the proposed

change will alter the regulatory program so that it no longer meets the qualification for certification established in this section and will result in a withdrawal of certification as provided in this section." (*Ibid.*)

The state argues that the provision for preemption of local control is irrelevant to recertification, that appellants have identified no other specific change in the timber harvesting plan procedures, and that such changes as have in fact occurred have raised rather than lowered the standard of environmental protection. The state's points are well taken. Forestry's implicit decision not to resubmit the timber harvesting plan procedures cannot be characterized as a violation of law or as an abuse of the agency's discretion.

III. *Cumulative impacts.*

Invoking the First District's innovative opinion in *Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604 [216 Cal.Rptr. 502] (*EPIC*), appellants argue that these plan approvals were improper because Forestry did not undertake a "cumulative impact analysis."

We have not found the term "cumulative impact" in the statutes. The concept can be tracked to CEQA, which specified that the guidelines "shall require a finding that a project may have a 'significant effect on the environment' " (for the purpose of determining in the first instance whether an EIR will be required) if (among other things) "[t]he possible effects of a project are individually limited but cumulatively considerable. As used in this subdivision, 'cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Pub. Resources Code, § 21083, subd. (b); cf. Guidelines, § 15065.)

If an EIR is required, CEQA specifies its content in broad terms. (Pub. Resources Code, §§ 21061, 21100 et seq., 21150-21151.) The statute does not explicitly refer to *cumulative* causes, effects, or impacts in this context; it does require, more generally, that the EIR "include a detailed statement setting forth" among other things "[t]he significant environmental effects of the proposed project." (*Id.*, § 21100, subd. (a); cf. *id.*, §§ 21061, 21150.)

It is in the guidelines that one finds an express requirement that "significant" *cumulative* impacts be discussed in an EIR, and detailed directions (based in substantial part on *Whitman* v. *Board of Supervisors* (1979) 88

Cal.App.3d 397, 406-409 [151 Cal.Rptr. 866]) as to what the discussion should contain. (Guidelines, § 15130.)

The Guidelines also provide a definition of "cumulative impacts": " 'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.

"(a) The individual effects may be changes resulting from a single project or a number of separate projects.

"(b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Guidelines, § 15355.)

This and other courts have dealt with the cumulative impact concept in the CEQA context. ▓▓▓ One judicially-recognized function of the concept is to assure that potential environmental impacts will not be misleadingly minimized by "chopping a large project into many little ones . . . ." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017]; cf. *id.* pp. 279-284; *City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325, 1331-1338 [232 Cal.Rptr. 507]; *City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 537-540 [230 Cal.Rptr. 867]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 241-245 [227 Cal.Rptr. 899]; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 164-169 [217 Cal.Rptr. 893]; *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 72-77 [198 Cal.Rptr. 634].)

A few courts have used the term "cumulative impact analysis," and have perceived in CEQA and the Guidelines a requirement for such an "analysis" either for the purpose of determining whether an EIR is required· (cf. *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 904 [223 Cal.Rptr. 379]) or as part of the EIR if prepared (*Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 429-432 [222 Cal.Rptr. 247]; *San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra,* 151 Cal.App.3d 61, 72-77.)

▓▓▓ There is no express reference to cumulative impacts or any equivalent concept in the Forest Practice Act or Rules, and nothing on the face

or in the structure of the two statutes appears to compel *EPIC's* conclusion that the cumulative-impact provisions of CEQA and its Guidelines apply literally to the timber harvesting plan procedure. Forestry, by virtue of the certification under Public Resources Code section 21080.5, is excused from the EIR requirement altogether: It need neither decide whether an EIR would be required nor prepare one in any event. Thus the specific cumulative-impact provisions of the Guidelines cannot be said to be directly applicable to the timber harvesting plan procedure. In this narrow and literal sense we would agree with the trial court's conclusion that "[t]he criteria of . . . section 21080.5 [do] not specify or require cumulative analysis of environmental impacts" under the Act and Rules as certified.

If *EPIC's* conclusion with respect to cumulative impacts is to be rationalized it must be in terms of *EPIC's* considerably broader holding that certification "does not except the [timber] industry from adhering to the broad policy goals of CEQA . . . , and to CEQA's substantive standards designed to fulfill the act's goal of long-term preservation of a high quality environment for the citizens of California." (*EPIC, supra,* 170 Cal.App.3d at p. 620.) In these broader terms one would reason that CEQA's specific cumulative-impact provisions constitute recognition of the abstract significance of cumulative impacts to an environmental inquiry, and that in this abstract sense significant cumulative impacts must be considered in the course of *any* environmental inquiry subject to CEQA's broad policy goals, whether or not also subject to CEQA's EIR requirements.

We cannot quarrel with the proposition that Forestry, as it exercises its regulatory functions under the Act and Rules, must consider each timber harvesting plan in its full environmental context and not in a vacuum. To us the importance of seeing the entire environmental picture is unaffected by labels developed under CEQA. The relevant question will be whether, in a given case, Forestry has adequately considered the entire relevant environmental picture. We agree with *EPIC* insofar as it may be read to say that in the timber harvesting plan review process Forestry must consider all significant environmental impacts of a proposed timber harvesting plan, regardless whether those impacts may be expected to fall on or off the logging site, and regardless whether those impacts would be attributable solely to activities described in the timber harvesting plan or to those activities in combination with other circumstances including but not necessarily limited to other past, present, and reasonably expectable future activities in the relevant area.

Such a rule would require Forestry in every case to make at least a preliminary search for potential cumulative environmental effects, and, if any such effect were perceived, at least a preliminary assessment of its

significance. Were Forestry to determine that there were one or more significant potential cumulative effects, then it would be obliged to give careful consideration to those effects in determining whether, and if so upon what conditions if any, to approve the timber harvesting plan.

■ Did Forestry look for potential cumulative environmental effects in this matter? Did it respond appropriately to suggestions there were such effects? If such effects existed did Forestry give them adequate consideration? The trial court did not explicitly discuss these questions; implicitly it concluded that Forestry had proceeded properly.

■ We must begin by fixing the scope of the record from which, and the standard of review by which, we must evaluate the trial court's conclusion.

The record before us consists of clerk's and reporters' transcripts of the trial-court proceedings and, as part of that record, the administrative record of Forestry proceedings on the timber harvesting plan. The state argues that only the administrative record is subject to judicial review.

With respect to the cumulative-impact issues we agree with the state. Here the appellants' challenge is not to the abstract validity of the Act and Rules but rather to the propriety of Forestry's approval of the plans, under the Act and Rules, in the specific circumstances in which the plans were submitted. With respect to these issues the trial court was, and we are, called upon to review the quasi-adjudicatory action of a state agency which (in the circumstances of this case) was required by law to conduct a hearing and to take evidence at the hearing (cf. Pub. Resources Code, § 4582.6, subd. (b)), and in which discretion in the determination of facts was vested. Accordingly the process of judicial review was in the nature of administrative mandamus (cf. Code Civ. Proc., § 1094.5), and subject to the various rules and limitations applicable to that procedure. (Cf. also *EPIC, supra,* 170 Cal.App.3d at p. 614, citing the CEQA review provisions (Pub. Resources Code, §§ 21168, 21168.5].) ■ Under these rules the issue is whether Forestry prejudicially abused its discretion: Such an abuse would be shown either if Forestry's decision were not supported by substantial evidence or if Forestry had not proceeded as required by law. (Cf. Code Civ. Proc., § 1094.5, subds. (b), (c); *EPIC, supra;* Pub. Resources Code, § 21168.) ■ Only in rare circumstances—not shown here—could the administrative record be augmented, and in no event could evidence beyond that properly added to the administrative record by augmentation be considered by the trial court: Review would be limited to the administrative record. (Cf. *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 264-265 [246 P.2d 656]; *Windigo Mills* v. *Unemployment Ins. Appeals Bd.* (1979) 92

Cal.App.3d 586, 595 [155 Cal.Rptr. 63]; Deering, Cal. Administrative Mandamus. (Cont.Ed.Bar 1966) §§ 13.5-13.10, pp. 218-224.)

 Appellants' contention is that Forestry did not proceed as required by law. The trial court necessarily rejected that contention. Our task is to determine whether the administrative record supported the trial court's conclusion.

The administrative record of proceedings on each plan consists of Forestry's file and a transcript of the public hearing. Although the transcript of the 28 Plan hearing appears not to have been formally admitted in evidence, we are satisfied the trial court had the entire record before it. (Cf. *City of Carmel-by-the-Sea* v. *Board of Supervisors, supra*, 183 Cal.App.3d 229, 236.)

Examination of the administrative record persuades us there was no basis for invalidating the 5 Plan approval on cumulative-impact grounds: In the course of processing the 5 Plan the term itself was mentioned only once and in passing, and although there was some mention of previous incidents of flooding and erosion in the relevant area there was no suggestion that anyone perceived any significant cumulative environmental effect relevant to the 5 Plan. Nor, in this court, do appellants appear to pursue a cumulative-impacts theory with respect to the 5 Plan: They focus this argument upon the 28 Plan.

The administrative record pictures the Lompico Creek watershed as a relatively narrow valley, delimited by high ridges to the west, north, and east, through which Lompico Creek flows in a southerly direction toward its confluence with Zayante Creek. Several smaller creeks descend from the ridges into Lompico Creek. The 28 Plan site is at the top of the ridge to the east; a few of the creeks descend from the ridge on or near the 28 Plan site to Lompico Creek.

The homeowners live below the 28 Plan site, most of them between the site and Lompico Creek. The homeowners' primary concerns, borne of their experiences in disastrous storms in 1982 and 1983, were that the 28 Plan logging would alter drainage patterns and accelerate erosion and thus would increase the risk of damage to the homeowners' water supplies and, by accumulation of debris, to their physical properties, comparable to the damage caused in 1982 and 1983.

The risk that these offsite impacts would be caused by the 28 Plan logging was exacerbated, in the homeowners' view, by several circumstances to which they directed Forestry's attention by letters and by testimony at the public hearing:

(1) *The 5 Plan*: The 5 Plan site is separated from the 28 Plan site by a ridge crest, but both are in the Lompico Creek watershed. A county representative suggested that the plans must be considered together to avoid piecemeal consideration of apparently separate but actually related logging projects.

(2) *Other timber harvesting plans*: From the administrative record it appears there had been two timber harvesting plans in the Lompico Creek watershed before 1982: One in 1970 and the other in 1979.

(3) *Happy Land*: In the late 1960's, preliminary grading was done for a subdivision to be called "Happy Land," located on the lower slopes of the Lompico Creek watershed. The homeowners asserted the Happy Land subdivision grading created a persistent predisposition to water and debris damage in the watershed.

(4) *Future development*: A county representative tendered evidence the proponents of the 28 Plan intended to proceed directly from logging to residential land development without additional environmental review. This argument evokes the several land-use cases which have recognized "the need to consider the cumulative environmental effects of agency action before a project gains irreversible momentum." (*City of Carmel-by-the-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d 229, 242.)

(5) *1982 and 1983 storms*: Almost every witness argued that the effects of the 1982 and 1983 storms themselves suggest a predisposition to water and debris damage within the watershed.

As a matter of law the showing of record was sufficient at least to have put Forestry on notice of potential cumulative environmental effects.

On the other hand the showing did not quantify the risks to be anticipated were both plans logged. It is fair to say the showing tendered by the homeowners and local entities and agencies demonstrated *apprehension* of harm far more clearly than *probability* of harm. How the various listed conditions might interrelate, or how the 28 Plan might somehow become the necessary catalyst of harm to water supplies and property throughout the watershed, was not made clear.

Appellants appear to argue that the burden fell upon Forestry to quantify the cumulative risks by means of a "cumulative impact analysis." By "cumulative impact analysis" appellants seem to mean a formal statistical evaluation of the degree to which logging under the 28 Plan, considered

with other existing or reasonably expected conditions in the watershed, would increase the risk of landslide and runoff damage.

If this is appellants' argument we disagree with it. In this sense a "cumulative impact analysis" would be an essentially academic exercise in probabilities. We acknowledge that the Guidelines would require, as part of an EIR, "a reasonable analysis" of relevant cumulative impacts. (Guidelines, § 15130; cf. *Citizens to Preserve the Ojai* v. *County of Ventura, supra,* 176 Cal.App.3d 421, 430-432.) But again we point out that a Guideline which specifies the content of an EIR is not directly relevant to the certified timber harvesting plan procedure. What is required is not that Forestry have performed an "analysis" as such, or have made its analysis available, as part of an EIR, for public review and comment, but only that Forestry have looked for and in some reasonable manner assessed potential cumulative environmental effects, and that it have given sufficient consideration to any such effect it should reasonably have considered significant.

But the administrative record does not reflect that Forestry has done any of these things. Forestry's file reflects its awareness of the 5 Plan, but no attempt to relate the two plans in terms of environmental impact. The director's major issue statement effectively rebuts the concern that Coast's activities are simply a prelude to residential development, but does not otherwise respond to the cumulative-impact issues. So far as can be learned from the administrative record, Forestry's approach appears to have been to minimize the adverse effects of logging operations on the 28 Plan site itself, and to assume that such minimization would sufficiently mitigate offsite impacts of whatever kind. Such an approach was expressly rejected, as "at odds with the concept of cumulative effect, which assesses cumulative damage as a whole greater than the sum of its parts," in *Epic, supra,* 170 Cal.App.3d at page 625.

In the circumstances of this case the trial court could not have presumed from a silent administrative record that Forestry had discharged its duties with respect to cumulative environmental effects. In any case it would be the better practice to incorporate appropriate recitals into the administrative record. Here, where the administrative record demonstrates that cumulative impact issues were vividly and repeatedly brought to Forestry's attention, by correspondence and at a public hearing, Forestry was required at an absolute minimum to incorporate an adequate response into its major issue statement. (Pub. Resources Code, § 4582.6; Rules, §§ 1037.8, 1115.3.) The record compels a conclusion that Forestry did not proceed as required by law. The trial court should have concluded that Forestry's approval of the 28 Plan was a prejudicial abuse of its discretion.

We do not suggest Forestry was obliged to disapprove the timber harvesting plan, or even to order additional ameliorative measures, on the basis of the expressed concerns of witnesses and correspondents that cumulative environmental effects might exceed tolerable levels. But Forestry should at least have *considered* these concerns in good faith and to the extent their gravity might reasonably have warranted. And if it had done so, it should have gone one step further: If only in the major issue statement, and if only by way of a declaration that, for reasons stated, the expressed concerns were deemed too remote and speculative to be significant, Forestry should have made the administrative record show the requisite consideration.

Nearly four years have passed since the 28 Plan was approved. Physical conditions in the Lompico Creek watershed may be much different now. Coast's apparent inactivity in the interim may imply that it no longer intends to log the 28 Plan site. In all the circumstances a remand for further trial court proceedings is inappropriate. Should Coast wish to proceed it may reasonably be required to recommence the process by filing a new timber harvesting plan.

In a single sentence at the end of their opening brief the homeowners "further request attorney's fees pursuant to [Code of Civil Procedure section] 1021.5." The homeowners briefly renewed this request at oral argument. No other party has commented on the request, and the homeowners have neither directed us to relevant evidence of record nor tendered argument as to why the circumstances of record would meet all of the criteria of section 1021.5. We have some doubt the requested award would be appropriate: The pivotal determination is attributable primarily to *EPIC* rather than to appellants' efforts in this case, and in any event it is clear that the county, rather than the homeowners, has borne the laboring oar for appellants in this court. Nevertheless we are mindful of the possibility the homeowners may be entitled to such an award. (Cf., e.g., *Los Angeles Police Protective League* v. *City of Los Angeles* (1986) 188 Cal.App.3d 1, 11-15 [232 Cal.Rptr. 697].) We shall direct the trial court to consider the matter, upon the homeowners' motion, in the first instance.

Insofar as it denies relief with respect to Timber Harvesting Plan #5-84-5 SCR the judgment is affirmed. With respect to Timber Harvesting Plan #5-84-28 SCR the judgment is reversed with directions to enter a new judgment which grants a peremptory writ of mandate ordering the California Department of Forestry to set aside its approval of said Plan #5-84-28 SCR and to disapprove the said plan. Upon duly noticed motion of any of appellants Ronald Laupheimer, Ronald Highsmith, and Lompico Creek Homeowners Association made within 30 days after issuance of the remittitur herein, the trial court shall determine whether and (if so) in what

amount the State of California should be required to pay attorney fees to these appellants, or any of them, under Code of Civil Procedure section 1021.5, and for that purpose shall take evidence if necessary, hear argument, and render a written decision. Subject to the trial court's determination with respect to attorney fees under section 1021.5, each party shall bear his or its own costs on appeal.

Capaccioli, J., and Premo, J.,* concurred.

A petition for a rehearing was denied May 9, 1988, and the petition of plaintiffs and appellants for review by the Supreme Court was denied June 29, 1988. Panelli, J., did not participate therein.

---

* Assigned by the Chairperson of the Judicial Council.