Opinion
 

 LAMBDEN, J.
 

 The Z’berg-Nejedly Forest Practice Act of 1973 (the Act or Forest Practice Act; Pub. Resources Code, § 4511 et seq. as amended; undesignated section references are to that code) generally requires submission of a timber harvest plan (THP), for review by the California Department of Forestry and Fire Protection (department or CDF) and an opportunity for public review and input, before logging operations may be conducted. Since 1976, the THP process as implemented by regulations promulgated under the Act by the State Board of Forestry (board or BOF) has been certified as the functional equivalent of the environmental impact report (EIR) process which otherwise would be required by the California Environmental Quality Act (CEQA; § 21000 et seq.).
 
 (T.R.E.E.S.
 
 v.
 
 Department of Forestry & Fire Protection
 
 (1991) 233 Cal.App.3d 1175, 1180 [285 Cal.Rptr. 26].) CDF reviews THP’s to ensure compliance with the Act, its regulations (Cal. Code Regs., tit. 14, §§ 895-1663.9; hereafter cited as rule(s) or forest practice rule(s)) and unsupplanted provisions of CEQA.
 
 (Environmental Protection Information Center
 
 v.
 
 Department of Forestry & Fire Protection
 
 (1996) 43 Cal.App.4th 1011, 1014 [50 Cal.Rptr.2d 892]
 
 (EPIC).)
 

 But the Act also authorizes BOF to adopt regulations exempting specified activities from the THP process. “Upon determining the exemption is consistent with the purposes of this chapter” (i.e., §§ 4511-4628), for example,
 
 *5
 
 the board may exempt “[t]he cutting or removal of dead, dying, or diseased trees of any size” (§ 4584, subd. (c)). The board may also define “emergencies” like “the necessity to harvest to remove fire-killed or damaged timber or insect or disease-infested timber,” which then allows an owner to file with CDF a “declaration of emergency”—an “ ‘emergency notice’ . . . that shall allow immediate commencement of timber operations” (§ 4592).
 
 [1]
 

 The board has promulgated regulations for both categories. Rule 1038, titled “Exemption,” allows the submission of a sworn exemption for harvesting “dead, dying or diseased trees of any size ... in amounts less than 10 percent of the average volume per acre” provided 10 limiting conditions are met.
 
 [2]
 
 Rule 1052, entitled “Emergency Notice,” requires a sworn declaration of “bona fide emergency” requiring emergency operations. The notice must
 
 *6
 
 describe specific conditions constituting the emergency, its cause, the “reason for immediate commencement,” the scope, manner and dates of intended operations, and other information.
 
 [3]
 
 As amended in December 1995, both
 
 *7
 
 rules give CDF five working days to assess whether a notice (exemption or emergency) is complete.
 

 The case before us grows out of salvage operations proposed by Louisiana-Pacific Corporation (L-P) in the Greenwood Creek watershed area near the coastal town of Elk, in Mendocino County. In late August 1993, L-P filed (1) an exemption notice (1-93EX-1135 MEN; rule 1038) for 1380 acres, citing a need to salvage dead, dying or diseased trees prompted by “blow down” damage from a windstorm in February of that year, and (2) an emergency notice (1-93EM-043 MEN; rule 1052) for a smaller, 109-acre parcel of more concentrated damage from the same storm.
 
 [4]
 
 CDF acknowledged both notices within a week, as L-P continued working with community representatives on local concerns.
 

 In mid-September, the Elk County Water District and the Greenwood Watershed Association, an affiliate of a nonprofit corporation Redwood Coast Watershed Alliance, filed this action in superior court for writ of mandate and injunctive and declaratory relief. They named CDF as respondent and L-P as real party in interest, but did not name EOF. They alleged CDF had wrongfully failed to (1) deny approval, (2) require a THP to assess significant environmental impacts, and (3) assess whether an exemption or emergency situation existed. One allegation was that “the Forest Practice Act and Rules regarding exemptions and emergency operations are not the functional equivalent of an EIR.”
 

 The court immediately issued a temporary restraining order (TRO) which, given short durations for the exemption and emergency notices, rendered the proposed operations infeasible. A stipulation in September between petitioners and L-P acknowledged this reality and memorialized L-P’s decision not
 
 *8
 
 to attempt operations under the notices, except for some erosion control work unaffected by the TRO. This development, of course, mooted any need for relief specific to the notices.
 
 (Environmental Protection Information Center, Inc.
 
 v.
 
 Maxxam Corp.
 
 (1992) 4 Cal.App.4th 1373, 1380 [6 Cal.Rptr.2d 665].)
 

 The matter was heard on the merits in March 1995, by a different judge, and was submitted on arguments and documents, without testimony. In her points and authorities, petitioners’ counsel had argued in part that BOF’s “current rules” were “not sufficient” and that a court was obliged to strike down regulations which were null and void. When the judge asked whether she was seeking to “invalidate the current rule[s] ... as being inconsistent with CEQA,” she answered: “Yes. And, Your Honor, the Supreme Court just did that in a very related case. . . .” She clarified, “Specifically, the relief requested is not to invalidate rules,” but conceded, “That will be the effect, Your Honor. . . .”
 

 By a written decision, the court (1) found BOF an indispensable party whose absence precluded reaching the validity of that agency’s exemption and emergency rules, (2) rejected arguments that CDF had to discretionarily review notices, under either the Forest Practice Act or CEQA, and (3) rejected, as unproved, allegations of irreparable injury and widespread abuse of the notice practice. Petitioners (collectively Elk) appeal the ensuing judgment. We affirm.
 

 Discussion
 

 I
 

 The court correctly ruled BOF an indispensable party. The Act charges BOF with rulemaking authority (§4551), including authority to define the exempt activity (§ 4584) and emergency (§ 4592) categories at issue here; CDF has only enforcement authority (§4119). Any judgmént declaring a BOF exemption or emergency rule invalid would therefore have left the promulgating agency unbound and the affected party, CDF, still charged with the rules’ enforcement. The board was thus an indispensable party (Code Civ. Proc., § 389, subd. (a); cf.
 
 Save Our Bay, Inc.
 
 v.
 
 San Diego Unified Port Dist.
 
 (1996) 42 Cal.App.4th 686, 692-693 [49 Cal.Rptr.2d 847];
 
 Welch
 
 v.
 
 Bodeman
 
 (1986) 176 Cal.App.3d 833, 839 [222 Cal.Rptr. 435];
 
 Sierra Club, Inc.
 
 v.
 
 California Coastal Com.
 
 (1979) 95 Cal.App.3d 495, 500 [157 Cal.Rptr. 190]), and the court was within its equitable discretion to proceed instead “among the parties before it” (Code Civ. Proc., § 389, subd. (b)) and not adjudicate the rules’ validity.
 

 
 *9
 
 Elk’s only direct retorts are these: (1) the board exists “in the department” (§ 730) and so assertedly need not be separately served; and (2) its counsel represented at the hearing below that a Ms. Bakus, former opposing counsel from the Attorney General’s office, had “indicated” a year earlier “she would not take the position that the Board was an indispensable party and preferred that we go this way.”
 

 Neither point is persuasive. Ms. Bakus’s claimed representation was disputed by current opposing counsel at the hearing, who understandably questioned whether counsel for CDF would even have power to bind BOF to such a “waiver.” Elk also cites us no authority supporting estoppel or any other theory which might overcome the defect. Elk likewise cites no authority holding one agency bound by a ruling affecting another simply because of an organizational relationship found only in code structure.
 

 Counsel for Elk cites another of her mandamus cases,
 
 Sierra Club
 
 v.
 
 County of Sonoma
 
 (1992) 6 Cal.App.4th 1307 [8 Cal.Rptr.2d 473], as authority that one need only name a county to secure review of the acts of the county’s board of supervisors. Even if the analogy fit, however, no such issue was raised or addressed in that opinion, which leaves it without precedential value on the point
 
 (Canales
 
 v.
 
 City of Alviso
 
 (1970) 3 Cal.3d 118, 128, fn. 2 [89 Cal.Rptr. 601, 474 P.2d 417]).
 

 We, like the trial court, therefore decline to assess the validity of the board’s rules. As a backup position, Elk offers a strategic course correction it also offered below. Elk reasons we can leave BOF’s rules intact—despite their lack of provision for CDF review of impacts, emergencies and exemptions—and impose review requirements judicially, as compelled by CEQA. This proposal has the sour stench of sophistry, for the requested judicial construction would obviously leave the rules functionally invalid. Nevertheless, we proceed briefly to refute the CEQA argument.
 

 II
 

 Elk frames its arguments variously, but we distill their essence as follows: (1) CEQA’s provision authorizing the certification of “functional equivalent” programs (§ 21080.5) mandates public review and comment which the Forest Practice Act, as implemented, lacks; (2) a certified program only supplants select provisions of CEQA, and CEQA’s own exemption and emergency provisions are found in other, unsupplanted sections; (3) the 1976 certification of the Forest Practice Act does not specifically refer to emergencies or exemptions under the Act; (4) those provisions should therefore be deemed “not a part of the certified regulatory program, but within a class
 
 *10
 
 of ‘categorical’ exemptions” governed by CEQA; and (5) this construction better protects the environment.
 

 CDF and L-P cumulatively offer this analytic framework in response: (1) exempt and emergency operations are not “projects” within CEQA; (2) if they are, they are not “discretionary” ones which CDF must “approve”; (3) they are, in any event, exempt as falling within the certified regulatory program; (4) any challenge to that certification is time-barred; and (5) if CEQA does govern exempt and emergency timber operations, it does not mandate public notice and review, as Elk supposes.
 

 Leaving some questions aside, we affirm the judgment by holding the exemption and emergency provisions do fall within the certified regulatory program. Because the issues of statutory and regulatory interpretation subsumed within that analysis are purely legal
 
 (Simplicity Pattern Co.
 
 v.
 
 State Bd. of Equalization
 
 (1980) 27 Cal.3d 900, 905 [167 Cal.Rptr. 366, 615 P.2d 555]) and unaffected by any factfinding below, we apply our independent judgment, though noting the trial court correctly reached the same result.
 

 Elk’s point about a certified regulatory program (§ 21080.5) mandating public review and comment which the Forest Practice Act and regulations lack, is unnecessary to address on the merits. Even if Elk were right, the exemption and emergency provisions (§§ 4584, 4592) and implementing rules were a part of the regulatory program when it was certified under CEQA in January 1976 as functionally equivalent to the EIR process. To argue deficiencies in the program now is to argue them 20 years too late
 
 (Laupheimer
 
 v.
 
 State of California
 
 (1988) 200 Cal.App.3d 440, 458-459 [246 Cal.Rptr. 82]; § 21080.5, subd. (h)(1) [action to attack certification as not in compliance must be brought within 30 days]). Moreover, as already explained (pt. I,
 
 ante),
 
 Elk cannot attack the rules themselves, as noncomplying, for the additional reason that the promulgating agency, BOF, is not a party here.
 

 Also, this court has recently noted the Legislature’s repeated amendments to the exemption provisions of the Act (§ 4584) “five separate times [between 1973 and 1994], each time adding new specific exemptions to the general requirement of a THP. . . .”
 
 (EPIC, supra,
 
 43 Cal.App.4th 1011, 1015.) The Legislature is presumed to be aware of long-standing administrative practice, and its failure to modify the Act in the ways Elk stresses here indicates acquiescence in that practice as consistent with legislative intent.
 
 (Coca-Cola Co.
 
 v.
 
 State Bd of Equalization
 
 (1945) 25 Cal.2d 918, 922 [156 P.2d 1];
 
 Horn
 
 v.
 
 Swoap
 
 (1974) 41 Cal.App.3d 375, 382 [116 Cal.Rptr.
 
 *11
 
 113].) The Act’s emergency provision (§ 4592) has likewise been amended twice (Stats. 1976, ch. 1300, § 97, pp. 5841-5842; Stats. 1994, ch. 746, § 4) without pertinent change.
 

 The only question then is whether, as Elk claims, the exemption and emergency provisions fall
 
 outside
 
 the certified regulatory program. Looking first to the seven-page certification document of January 6, 1976, by the Secretary of Resources, Elk notes the document makes no specific mention of the Forest Practice Act exemption or emergency provisions or implementing rules. We find this unremarkable given the document’s brevity and focus on the specific compliance criteria set out in section 21080.5, which do not specifically address exemptions or emergencies. We are cited no authority demanding specific mention in the certification to qualify for inclusion in a regulatory program. Were that so, most of the THP process would be outside the program.
 

 Elk’s other argument relies on the continued partial applicability of CEQA following program certification. “Under the terms of section 21080.5, subdivision (c), . . . certification expressly exempts the timber harvesting plan process from the provisions of chapters 3 and 4 and section 21167 of CEQA. (§ 21080.5, subd. (c).) Chapters 3 and 4 deal, in large part, with the various requirements of an EIR at both the state level (chapter 3) and the local level (chapter 4). Section 21167 sets forth the time within which an action challenging a public agency’s decision under the provisions of CEQA must be filed. [¶| Under the maxim of statutory construction,
 
 expressio unius est exclusio alterius,
 
 if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. [Citation.] CEQA is a legislative act, and the Legislature both had and retains the authority to limit the projects to which CEQA applies. It has specified in section 21080 those projects that are categorically exempt from CEQA. (§ 21080, subd. (b)(l)-(16).) Moreover, it has vested in the Secretary of the Resources Agency the authority to identify those projects that do not, as a class, have a significant effect on the environment and which are, as a consequence, exempt from the provisions of CEQA. (§ 21084, subd. (a).) The Legislature has not included timber harvesting operations within any of the classes of projects that are exempt from CEQA under sections 21080 and 21084. We therefore reject [the idea] that timber harvesting is ‘exempt’ from CEQA. Section 21080.5 compels instead the conclusion that timber harvesting in this state is exempt only from chapters 3 and 4 of CEQA and from section 21167 of that act.”
 
 (Sierra Club
 
 v.
 
 State Bd. of Forestry
 
 (1994) 7 Cal.4th 1215, 1230-1231 [32 Cal.Rptr.2d 19, 876 P.2d 505], fn. omitted
 
 (Sierra Club).)
 

 
 *12
 
 Thus authority was found in
 
 Sierra Club
 
 for CDF to request additional information from a harvester about old-growth-dependent wildlife species within a THP area. While the forest practice rules did not specify such information as among the exclusive criteria for approving a THP (see § 4582.75), a request for information was not “a
 
 criterion
 
 for reviewing a [THP],” but “instead a prerequisite to application of the criteria established by the board, in particular, [a] rule requiring the director to disapprove those plans which do not incorporate procedures to substantially lessen significant adverse impacts on the environment. ([Rule] 898.1, subd. (c)(1).)”
 
 (Sierra Club, supra,
 
 7 Cal.4th 1215, 1232-1233.) Authority to request the information was found in CEQA’s section 21160 (found in nonexempt chapter 5), which likewise authorized a public agency to require the submission of information needed to determine whether a proposed project might have a significant effect on the environment. (7 Cal.4th at pp. 1231, 1233-1235.)
 

 Elk would extend that rationale here, but there is no direct correlation. No THP is needed, of course, for the exempt and emergency operations at issue here; if CDF “may,” under CEQA, require information disclosing possible environmental effects (§ 21160), this would hardly create a mandatory duty on the department to do so; Elk’s concern in any event is public notice and comment, and nothing in the Forest Practice Act or rules requires that.
 

 Elk offers an indirect correlation, in this manner: (1) certification leaves the THP process exempt from CEQA’s chapters 3 and 4 relating to EIR’s; (2) CEQA’s provisions for emergency and categorical exemptions from EIR’s (§§ 21080, 21084) are found in chapter 2.6 (§ 21080 et seq.); (3) the Forest Practice Act exemptions should likewise be considered not part of the exempt regulatory program but controlled by CEQA; and (4) CEQA requires public review for significant environmental effects.
 

 The reasoning stumbles badly on point (3). Although the provisions for EIR exemptions are found in chapter 2.6 rather than the expressly exempt chapters 3 and 4, it does not follow that THP exemptions are controlled by chapter 2.6. A certification which exempts timber harvesting from the EIR process and substitutes the THP process, as a functional equivalent, exempts by implication those categories of activities which the THP process itself exempts. We also agree with the court below, which noted, “[Elk’s contrary argument] leads to the illogical conclusion that exempt activity involving what is surely considered relatively inconsequential activity is subject to EIR procedures while full scale logging activity is not.”
 

 Elk relies on a 1985 augmentation of the forest practice rules—chapter 12 entitled “Regulations for the Implementation of [CEQA]” (rule 1660 et
 
 *13
 
 seq.)—which created as a categorically exempt activity the “Establishment, modification, or dissolution of zones of insects, disease, or animal infestation or infection. . . .” (Rule 1662.6, subd. (b).) Noting the rule postdates the 1976 THP-program certification and broadly concerns “Protection of Natural Resources,”
 
 [5]
 
 Elk contends rule 1662 “encompasses all exemptions subject to this appeal” and thus controls the THP exemptions specified in the Forest Practice Act and brings into play the asserted public review requirements of CEQA.
 

 We disagree. Elk’s facile logic, while purportedly affecting only “exemptions subject to this appeal,” in fact would apparently reach
 
 any
 
 exemption, for all of them could be characterized as somehow relating to environmental protection. Indeed, all of the Forest Practice Act itself broadly deals with protection of the environment, as does all of CEQA. We see no indication that chapter 12 of the forest practice rules was meant to swallow up all exemptions of the former act within CEQA’s exemption processes.
 
 [6]
 

 Next, the “public review” assumption (part (4)) of Elk’s rationale is overstated. CEQA guidelines do ask a public agency to scrutinize categorically exempt activities which in unusual circumstances may have significant effects due to considerations like particularly sensitive habit or cumulative impacts. (Cal. Code Regs., tit. 14, § 15300.2;
 
 Dunn-Edwards Corp.
 
 v.
 
 Bay Area Air Quality Management Dist.
 
 (1992) 9 Cal.App.4th 644, 656 [11 Cal.Rptr.2d 850].) Elk cites no authority, however, compelling an agency to give notice or hold a public hearing on how it should exercise that discretion, and case law is to the contrary.
 
 (Association for Protection etc. Values
 
 v.
 
 City of Ukiah
 
 (1991) 2 Cal.App.4th 720, 731-732 [3 Cal.Rptr.2d 488].) Similarly, emergency exemptions under CEQA are given agency scrutiny for true
 
 *14
 
 “emergency” status, but case law holds the question of adverse impacts irrelevant to that process.
 
 (Western Mun. Water Dist.
 
 v.
 
 Superior Court
 
 (1986) 187 Cal.App.3d 1104, 1113-1114 [232 Cal.Rptr. 359].)
 

 Finally, Elk’s policy plea—that the environment would be better protected by having public review and input—is appealing but addressed to the wrong forum. The existing certified program, as authorized by the Legislature, does not require it, and “. . . it is the board, and not the court, that establishes forest policy.”
 
 (Public Resources Protection Assn.
 
 v.
 
 Department of Forestry & Fire Protection
 
 (1994) 7 Cal.4th 111, 120 [27 Cal.Rptr.2d 11, 865 P.2d 728].)
 

 III
 

 Elk requests we take judicial notice (Evid. Code, §§ 452 & 453) of “federal documents relating to water quality impacts relative to timber harvesting exemptions and the Elk County Water District . . . .” In fact, these are two letters, one each from the regional administrators of two federal agencies (United States Environmental Protection Agency and United States Deptartment of Commerce, National Marine Fisheries Service) expressing only general concern over lack of environmental review of possible impacts of exempt or emergency salvage logging on marine habitat generally. Neither letter addresses the proposed timber operations at issue here, and Elk offers no analysis whatsoever to support the propriety of our taking judicial notice, particularly the letters’ relevance and competence as evidence.
 
 (Mangini
 
 v.
 
 R. J. Reynolds Tobacco Co.
 
 (1994) 7 Cal.4th 1057, 1063-1064 [31 Cal.Rptr.2d 358, 875 P.2d 73].) We deny the request for those reasons alone. Also, our analysis in part II is the same even if we assume a general risk of significant environmental effects from use of the notice procedures.
 

 Disposition
 

 The judgment is affirmed.
 

 Kline, P. J., and Haerle, J., concurred.
 

 [1]
 

 Section 4584 provides in pertinent part: “Upon determining that the exemption is consistent with the purposes of this chapter, the board may exempt from this chapter or portions thereof, any person engaged in forest management whose activities are limited to any of the following: [¶ ... [¶ (c) The cutting or removal of dead, dying, or diseased trees of any size.”
 

 Section 4592 provides in pertinent part: “Notwithstanding any other provisions of this chapter, a registered professional forester [(RPF)] may in an emergency, on behalf of a timber owner or operator, file an ‘emergency notice’ with the department that shall allow immediate commencement of timber operations. The emergency notice shall include a declaration, under penalty of perjury, that a bona fide emergency exists which requires immediate harvest activities.... Those emergencies shall be defined by the board and may include, but are not limited to, the necessity to harvest to remove fire-killed or damaged timber or insect or disease-infested timber, or to undertake emergency repairs to roads.”
 

 [2]
 

 Rule 1038 provides in part: “Persons who conduct the following types of timber operations are exempt from the plan preparation and submission requirements ([§] 4581) and from the completion report and stocking report requirements ([§§] 4585 and 4587) of the Act:
 

 “(b) Harvesting dead, dying or diseased trees of any size, fuelwood or split products in amounts less than 10 percent of the average volume per acre when the following conditions are met:
 

 “(1) No tractor or heavy equipment operations on slopes greater than 50 percent.
 

 “(2) No construction of new tractor roads on slopes greater than 40 percent.
 

 “(3) Timber operations within any Special Treatment Area shall comply with the rules associated with that Special Treatment Area.
 

 “(4) No tractor or heavy equipment operations on known slides or unstable areas.
 

 “(5) No new road construction or reconstruction (as defined in [rule] 895.1).
 

 “(6) No heavy equipment operations within a watercourse or lake protection zone except for maintenance of roads and drainage facilities or structures.
 

 “(7) No known sites of rare, threatened or endangered plants or animals will be disturbed, threatened or damaged.
 

 “(8) No timber operations within the buffer zone of a species of special concern (as defined in [rule] 895.1).
 

 “(9) No timber harvesting in a watercourse or lake protection zone except sanitation-salvage harvesting.
 

 “(10) No timber operations on any site that satisfies the criteria listed in [rule] 895.1 for a significant archaeological or historical site. Information on some of these sites may be
 
 *6
 
 available from the Information Centers of the California Historical Resources Information System within the Department of Parks and Recreation.
 

 “The Director [of Forestry] may issue exceptions to these conditions if it will not result in significant effect on the environment as defined in [rule] 1038).
 

 “(e) The limit of 10 percent of the volume per acre in subsection (b) above does not apply when harvesting dead trees which are unmerchantable as sawlog-size timber from substantially damaged timberlands, and the conditions of subsection (b)(l)-(10) are met.
 

 “Operations pursuant to an exemption under subsection (d) and (e) may not commence for five working days from the date of the Director’s receipt of the exemption unless this delay is waived by the Director, after consultation with other state agencies. The Director shall determine whether the exemption is complete, and if so, shall send a copy of a notice of acceptance to the submitter. If the exemption is not complete and accurate it shall be returned to the submitter and the timber operator may not proceed. If the Director does not act within five days of receipt of the exemption, timber operations may commence.
 

 “All of the following shall apply to exemptions submitted under subsection (e). “The landowner shall notify the Director of the completion of timber operations within 30 days of their cessation.
 

 “At least one inspection conducted by the Director shall be made after the completion of operations (Section 4604 . . .).
 

 “The RPF or the Director shall certify that the lands are substantially damaged timberland. The RPF or the Director shall also certify that no conditions were identified where operations, conducted in compliance with the rules of the Board, would reasonably result in significant adverse effects.
 

 “A person conducting timber operations under any exemption as described in [rule] 1038(f), shall be limited to one year from the date the Department receives the exemption form. A person shall comply with all operational provisions of the Forest Practice Act and District Forest Rules applicable to ‘Timber Harvest Plan’, ‘THP’, and ‘plan’. tt ”
 

 [3]
 

 Rule 1052 provides: “Before cutting or removing timber on an emergency basis, an RPF on behalf of a timber owner or operator shall submit a Notice of Emergency Timber Operations to the Director, in a form prescribed by the Director. Said notice shall contain a declaration, made under penalty of perjury, that a bona fide emergency exists which requires emergency timber operations. The notice shall include, but not be limited to, the following:
 

 “(a) Names and addresses of all timberland owner(s), timber owner(s), and timber operators for the area on which timber will be cut or removed.
 

 “(b) A description of the specific conditions that constitute the emergency, its cause, extent and reason for immediate commencement of timber operations.
 

 “(c) Legal description of the area from which timber will be cut or removed.
 

 “(d) A map of suitable scale showing the area from which timber will be cut or removed, the legal description, roads and Class I, II, III and IV watercourses.
 

 “(e) Harvesting method to be followed.
 

 “(f) The expected dates of commencement and completion of timber operations.
 

 “(g) Name, address, license number, and signature of the RPF who prepares the notice and submits it to the Director on behalf of the timber owner or operator. Timber operations pursuant to an emergency notice shall comply with the rules and regulations of the Board,
 
 *7
 
 except where, upon agreement between the RPF and the Department, waiver of a rule would better mitigate the causes of a non-financial emergency. A person conducting timber operations under an Emergency Notice shall comply with ail operational provisions of the Forest Practice Act and District Forest Practice Rules applicable to ‘Timber Harvest Plan’, ‘THP’, and ‘plan’. Timber operations pursuant to an Emergency Notice may not commence for five working days from the date of the Director’s receipt of the Emergency Notice unless such waiting period is waived by the Director. The Director shall determine whether the emergency notice is complete. If it is found to be complete the Director shall send a copy of a notice of acceptance to the timberland owner. If the Emergency Notice is not complete it shall be returned to the submitter. If the Director does not act within five working days of receipt-of the Emergency Notice, timber operations may commence. Timber operations shall not continue beyond 120 days after the Emergency Notice is accepted by the Director unless a plan is submitted to the Director and found to be in conformance with the rules and regulations of the Board.”
 

 [4]
 

 Rule 1052.1, subdivision (b) specifies that emergency conditions include “[t]rees that are fallen, damaged, dead or dying as a result of wind, snow, freezing weather, fire, flood, landslide or earthquake.”
 

 [5]
 

 Rule 1662.6 reads in full: “Action by Regulatory Agencies for Protection of Natural Resources.
 

 “Class 7: Department projects under this class will consist of actions authorized by state law or local ordinances to assure the maintenance, restoration or enhancement of natural resources where the regulatory process involves procedures for protection of the environment including, but not limited to:
 

 “(a) Establishment, modification, or dissolution of hazardous fire areas in accordance with Section 4253 of the Public Resources Code;
 

 “(b) Establishment, modification, or dissolution of zones of insects, disease, or animal infestation or infection;
 

 “(c) Controlled burning pursuant to Section 4423 of the Public Resources Code.
 

 “(d) Closures of land or access for fire protection purposes; and
 

 “(e) Forest product waste disposal and storage.”
 

 [6]
 

 Taking a broader approach to this issue, L-P argued for the first time at oral argument that the chapter 12 rules are designed to address not logging operations under the THP processes, but certain activities of CDF’s own, like pest and fire control, which remain subject to CEQA. We need not decide the question.