[No. B189869. Second Dist., Div. Four. Sept. 26, 2007.]

THE BOARD OF TRUSTEES OF THE CALIFORNIA STATE
UNIVERSITY, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
CALIFORNIA FACULTY ASSOCIATION, Real Party in Interest.

868

## COUNSEL

Hanson, Bridgett, Marcus, Vlahos & Rudy, Allison M. Woodall, Douglas H. Barton; Christine Helwick and Donald A. Newman for Petitioner.

Robin Wesley and Tammy Samsel for Respondent.

Rothner, Segall & Greenstone, Glenn Rothner; Kennedy, Jennik & Murray and Bernhard Rohrbacher for Real Party in Interest.

## OPINION

**WILLHITE, Acting P. J.**—Ruling on an unfair labor practice charge brought by the California Faculty Association (CFA), the Public Employment

Relations Board (PERB) concluded that Government Code section 3572.5, subdivision (b)(1), and Education Code section 89542.5, subdivision (a)(4), preclude the Board of Trustees of the California State University (the University) from insisting that a memorandum of understanding contain limits on the authority of an arbitrator to overturn a campus president's decision on faculty appointment, reappointment, tenure, or promotion. Because during negotiations on a new memorandum of understanding the University had insisted to impasse upon a proposal containing such restrictions, PERB found that the University had engaged in an unfair labor practice.

On this petition for review by the University (Gov. Code, §§ 3542, 3564; Cal. Rules of Court, rule 8.498), we hold that PERB's interpretation of the statutes is "clearly erroneous." (See *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 586–587 [262 Cal.Rptr. 46, 778 P.2d 174] (*Cumero*).) Neither the plain language of the statutes, nor the relevant legislative history, supports PERB's interpretation. To the contrary, the statutes impose no prohibition against limiting the powers of an arbitrator hearing a faculty grievance to reverse a campus president's decision on appointment, reappointment, tenure, or promotion. We therefore issue a writ of mandate ordering PERB to reverse its decision sustaining CFA's allegation of unfair labor practice, and to enter a new decision denying it.

## BACKGROUND

*Education Code Section 89542.5*

Effective 1976, the Legislature enacted Education Code former section 24315, which was later renumbered section 89542.5. (Stats. 1975, ch. 912, § 1, pp. 2015–2016; Stats. 1976, ch. 1010, § 2, pp. 2384, 4470–4471.) Throughout our opinion, we refer to the statute by the latter number, section 89542.5, without code designation.[1]

In terms substantively unchanged since its enactment in 1976, section 89542.5 requires the University to "establish grievance and disciplinary action procedures" for academic employees. (§ 89542.5, subd. (a).) Among these is that "[g]rievances . . . shall be heard by a faculty hearing committee . . . which

---

[1] Section 89542.5 provides in its current form:
"(a) The Trustees of the California State University shall establish grievance and disciplinary

shall make a recommendation to the president of the state university" (§ 89542.5, subd. (a)(1)), and that "[i]f there is disagreement between the faculty hearing committee's decision and the state university president's decision, the matter shall go before an arbitrator whose decision shall be final" (§ 89542.5, subd. (a)(4)). The term "grievance" was defined in relevant part as "an allegation by an employee that he was directly wronged in connection with the rights accruing to his . . . appointment, reappointment, tenure, promotion, reassignment, or the like." (Stats. 1975, ch. 912, § 1, pp. 2015, 2016; see now § 89542.5, subd. (b).)

---

action procedures for all academic employees, including all temporary employees who have been employed for more than one semester or quarter, whereby all of the following requirements are satisfied:

"(1) Grievances and disciplinary actions shall be heard by a faculty hearing committee composed of full-time faculty members, selected by lot from a panel elected by the campus faculty, which shall make a recommendation to the president of the state university.

"(2) The grievance or disciplinary hearing shall be open to the public at the option of the person aggrieved or the person charged in a disciplinary hearing.

"(3) Each party to the dispute shall have the right of representation by a faculty adviser or counsel of his or her choice and to be provided access to a complete record of the hearing.

"(4) If there is disagreement between the faculty hearing committee's decision and the state university president's decision, the matter shall go before an arbitrator whose decision shall be final.

"(5) The costs incurred in arbitration shall be paid by the state university.

"(6) If the parties cannot agree upon an arbitrator, either party may petition the Federal Mediation Service, the State Conciliation Service, or the American Arbitration Association for a list of seven qualified, disinterested persons, from which list each party shall alternate in striking three names, and the remaining person shall be designated as the arbitrator.

"(7) The grievance procedure established pursuant to this section shall be exclusive with respect to any grievance that is not subject to a State Personnel Board hearing. In the case of a grievance or disciplinary action that is subject to a State Personnel Board hearing, pursuant to Sections 89535 to 89539, inclusive, and Section 89542, the procedures provided for in those sections or those provided for in this section may be utilized. The academic employee shall have the choice of which procedures shall be utilized.

"(b) For purposes of this section, a 'grievance' is an allegation by an employee that the employee was directly wronged in connection with the rights accruing to his or her job classification, benefits, working conditions, appointment, reappointment, tenure, promotion, reassignment, or the like. A grievance does not include matters, such as the salary structure, which require legislative action.

"(c) If a memorandum of understanding is agreed to pursuant to Chapter 12 (commencing with Section 3560) of Division 4 of Title 1 of the Government Code, and it provides for merit pay for academic employees of the university, the arbitration provisions of this section shall not apply to grievances concerning merit pay.

"(d) If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Chapter 12 (commencing with Section 3560) of Division 4 of Title 1 of the Government Code, the memorandum of understanding shall be controlling without further legislative action, except that, if the provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act."

*Executive Order No. 201*

Before passage of section 89542.5, University grievance procedures were governed by "Executive Order No. 201," which the University adopted in 1974. That order, for the first time, introduced arbitration as a step in a multitiered grievance procedure.[2] The arbitrator's power of review, however, was deferential to the president's decision, and substantive limits were placed on the ability of the arbitrator to overrule the president. Thus, the arbitrator's scope of review was limited to whether the president's rejection of the faculty grievance committee's recommendation was arbitrary, whether a substantially unfair departure from prescribed procedures had occurred that affected the president's decision, or whether the president ignored substantial evidence favorable to the grievant.

As we explain in more detail below, the Legislature was well aware of Executive Order No. 201 when it enacted section 89542.5. Indeed, the definition of "grievance" in section 89542.5, subdivision (b), was drawn from Executive Order No. 201. Further, the requirement of section 89542.5, subdivision (a)(4), that the arbitrator's "decision shall be final" echoed the language of Executive Order No. 201, which provided that the "arbitrator's decision . . . shall be final and binding upon the campus and the grievant."

*Executive Orders Nos. 240 and 301*

In 1976, following the passage of section 89542.5, the University enacted "Executive Order No. 240," and later followed it in 1978 with "Executive Order No. 301." The grievance procedures under both orders were substantially the same and contained limits on the authority of the arbitrator to set aside the campus president's decision when it disagreed with the recommendation of

---

[2] Under Executive Order No. 201, an evidentiary hearing on a faculty grievance would be held before a faculty grievance committee or a hearing officer (at the grievant's election), following which the faculty grievance committee would prepare a written recommendation for resolution of the grievance to the campus president. The committee's recommendation was binding on the campus president, unless unsupported by the findings of the hearing officer (if any), or unless the president concluded that compelling reasons existed for a different result.

If the president's decision differed from the committee's recommendation, the grievant could request arbitration. The arbitrator would consider only the prior administrative record. Findings by a hearing officer, if any, were binding. The arbitrator had the authority to decide only whether the president's rejection of the committee's recommendation was arbitrary, whether a substantially unfair departure from prescribed procedures had occurred that affected the president's decision, or whether the president ignored substantial evidence favorable to the grievant. If one or more of these grounds existed, the arbitrator would decide if the president's decision should be upheld, or the committee's recommendation should be followed, or the matter should be remanded for review absent the defect determined to exist.

the faculty grievance committee.[3] Consistent with section 89542.5, Executive Orders Nos. 240 and 301 provided that the arbitrator's decision, "insofar as consonant with" the law and University rules and policies, "shall be final."

*Enactment of HEERA*

Effective July 1, 1979, the Legislature enacted the Higher Education Employer Employee Relations Act (HEERA), contained in Government Code section 3560 et seq. Among other things, HEERA granted the right of collective bargaining to University employees.

■ As enacted, HEERA provided in Government Code section 3572.5, subdivision (a), that if the provisions of section 89542.5 "are in conflict with a memorandum of understanding, the memorandum of understanding shall be controlling."[4] Thus, grievance procedures negotiated in a memorandum of understanding would supersede the procedures of section 89542.5, and the University and CFA were free to, and did, negotiate over such terms in reaching their first memorandum of understanding under HEERA.

*The First Memorandum of Understanding Under HEERA*

In 1983, the University and CFA reached a first memorandum of understanding under HEERA procedures. This and all successive agreements

---

[3] Under both Executive Orders Nos. 240 and 301, a three-person faculty grievance committee would hold an evidentiary hearing on the grievance, and prepare a report stating the committee's findings and recommendation. The committee's report and recommendation would be submitted to the campus president, and was binding unless (1) the committee's findings were not supported by a preponderance of the evidence; (2) the recommendation was not supported by the findings; (3) the committee prejudicially departed from prescribed procedures; or (4) the recommendation was beyond the president's authority to grant.

If the president disagreed with the committee's recommendation, the grievant or president could refer the matter to an arbitrator. On the prior record, without a hearing, the arbitrator would decide if the president's disagreement was justified. The grounds on which the disagreement might be justified were the same grounds on which the committee's recommendation was not binding on the president: (1) the committee's findings were not supported by a preponderance of the evidence; (2) the recommendation was not supported by the findings; (3) the committee departed from prescribed procedures; or (4) the recommendation was beyond the president's authority.

If the arbitrator determined that the president's disagreement was justified, the arbitrator was required to adopt the president's decision. On the other hand, if the disagreement was unjustified, the arbitrator was required to adopt the committee's recommendation. Finally, if the arbitrator found that the committee had prejudicially departed from prescribed procedures, the arbitrator could adopt the president's decision or send the matter back to the committee for rehearing.

[4] Effective September 1979, the Legislature likewise amended section 89542.5 to add what is now subdivision (d) of that statute, which provides that when there is a conflict between section 89542.5 and a memorandum of understanding, the memorandum controls. (Stats. 1979, ch. 1072, § 33, pp. 3803, 3804.)

contained the option of arbitration to resolve a faculty member's grievance concerning the campus president's decision on appointment, reappointment, tenure, or promotion. However, the agreements substantially restricted the authority of the arbitrator to set aside the campus president's decision.[5]

*The 1998–2001 Memorandum of Understanding*

In 1999, CFA and the University agreed to a memorandum of understanding retroactive to 1998 and extending to June 30, 2001. Before obtaining an agreement, however, the parties reached impasse in their negotiations. Because no memorandum of understanding was then in effect, the grievance procedures of section 89542.5 became effective during the impasse. The University implemented Executive Order No. 702, which contained interim grievance procedures similar to those prescribed by the prior agreements, but with certain changes to comport with section 89542.5, such as the inclusion of a faculty hearing committee, required by the statute but missing from prior agreements. Executive Order No. 702 was in effect for approximately three months until the parties agreed on the 1998–2001 memorandum of understanding.

*Enactment of Senate Bill No. 1212—Government Code Section 3572.5, Subdivision (b)*

The 1998–2001 memorandum of understanding expired on June 30, 2001. During negotiations on a successor agreement, the Legislature enacted and the Governor signed Senate Bill No. 1212 (2001–2002 Reg. Sess.), sponsored by CFA and opposed by the University. The bill added subdivision (b) to Government Code section 3572.5, effective October 12, 2001 (hereafter section 3572.5, subdivision (b)). Section 3572.5, subdivision (b), provides that for any memorandum of understanding reached after January 1, 2002, Education Code section 89542.5 "provides a minimum level of benefits or rights, and is superseded by a memorandum of understanding only if the relevant terms of the memorandum of understanding provide more than the minimum level of benefits or rights set forth in that section . . . ."[6]

---

[5] The restrictions included the following: (1) the arbitrator could not reverse the president's decision based on procedural error unless the error was proven by clear and convincing evidence to be prejudicial; (2) the normal remedy for procedural error was a remand for rehearing; and (3) the arbitrator could not grant appointment, reappointment, promotion, or tenure except in "extreme" cases where the final campus decision was not based on reasoned judgment, where but for that error the decision would have been to grant appointment, reappointment, promotion or tenure, and where no other remedy was practicable.

[6] Section 3572.5, subdivision (b), provides in full:

"(1) Notwithstanding the inclusion in Section 89542.5 of the Education Code, except with respect to paragraph (5) of subdivision (a) of that section, of a provision providing that, if the statute is in conflict with a memorandum of understanding reached pursuant to this chapter, the

*Negotiations over a Successor Memorandum of Understanding*

In negotiations over an agreement to succeed the 1998–2001 memorandum of understanding, CFA and the University disagreed on the effect of section 3572.5, subdivision (b). CFA argued that section 89542.5, subdivision (a)(4), confers unlimited power on an arbitrator to render a "final" decision reversing a campus president's decision in grievance proceedings involving appointment, reappointment, tenure, or promotion. Further, according to CFA, section 3572.5, subdivision (b), precludes placing any limits on that power through a memorandum of understanding. The University, on the other hand, argued that the statutes do not prohibit the parties from limiting the scope of the arbitrator's authority through collective bargaining. The University insisted that any new grievance procedure must maintain the existing contractual limits on the arbitrator's authority to set aside campus decisions on faculty grievances concerning appointment, reappointment, tenure, or promotion. Those limits were: (1) a campus president's decision could be overturned for procedural error only if the error was proved by clear and convincing evidence and was prejudicial; (2) the "normal remedy" for such procedural error was a remand for reevaluation, with the arbitrator having authority to retain jurisdiction; and (3) the arbitrator could not grant appointment, reappointment, tenure, or promotion except in extreme cases where the campus decision was not based on reasoned judgment, where it was certain that appointment, reappointment, promotion, or tenure would have been granted but for the error, and where no other alternative was practicable.

*PERB Proceedings*

CFA filed with PERB a request for a determination that an impasse existed. PERB declared an impasse, and the parties participated in statutory impasse proceedings (Gov. Code, § 3590), but were unable to resolve their differences regarding the arbitration issue.

CFA filed an unfair labor practice charge against the University. PERB concluded that by insisting to impasse upon a proposal that would preserve existing contractual limits on the authority of an arbitrator to decide grievances regarding appointment, reappointment, tenure, or promotion, the University violated its duty to bargain in good faith. PERB reasoned, in substance, that

---

memorandum of understanding shall be controlling without further legislative action, unless the memorandum of understanding requires the expenditure of funds, that section, except for paragraph (5) of subdivision (a) of that section, provides a minimum level of benefits or rights, and is superseded by a memorandum of understanding only if the relevant terms of the memorandum of understanding provide more than the minimum level of benefits or rights set forth in that section, except for paragraph (5) of subdivision (a) of that section.

"(2) This subdivision only applies to a memorandum of understanding entered into on or after January 1, 2002."

section 3572.5, subdivision (b), guarantees a minimum right to an arbitration that will result in a "final" decision as provided in section 89542.5, subdivision (a)(4), and that limiting the scope of the arbitrator's power in the manner of prior agreements would dilute that right. PERB relied primarily on the language of the statutes, and on the legislative history of section 3572.5, subdivision (b). PERB rejected the University's contention that the legislative history of section 89542.5 was more relevant than that of section 3572.5, subdivision (b).

The University petitioned for review. (Gov. Code, §§ 3542, 3564; Cal. Rules of Court, rule 8.498.) We granted review, and now reverse PERB's decision.

## DISCUSSION

The University contends that neither the plain meaning of the statutory language, nor the relevant legislative history, supports PERB's statutory interpretation. CFA and PERB disagree, echoing the reasoning of PERB's decision. We conclude that the University is correct. The plain meaning of the statutory language does not prohibit a memorandum of understanding from defining the powers of the arbitrator to review a campus president's decision on appointment, reappointment, tenure, or promotion. Moreover, consideration of the relevant legislative history—that of section 89542.5, not that of section 3572.5, subdivision (b)—leads to the same conclusion.

*Plain Meaning*

Statutory interpretation begins with the plain meaning of the language used. When construing a statute, we must " ' "ascertain the intent of the lawmakers so as to effectuate the purpose of the law." ' [Citations.] We begin by examining the language of the statute, giving the words their ordinary meaning. [Citation.] 'The words, however, must be read in context, considering the nature and purpose of the statutory enactment.' [Citation.] In this regard, sentences are not to be viewed in isolation but in light of the statutory scheme. [Citation.]" (*Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777 [63 Cal.Rptr.2d 859, 937 P.2d 290].)

PERB's interpretation of a statute within its area of expertise " 'is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally be followed unless it is clearly erroneous. [Citations.]' [Citation.] 'It is, however, "the duty of this court, when . . . a question of law is properly presented, to state the true meaning of the statute . . . even though this requires the overthrow of an earlier administrative construction." [Citation.]' [Citation.]" (*Cumero, supra,* 49 Cal.3d at pp. 586–587.)

In the instant case, the plain meaning of Government Code section 3572.5, subdivision (b)(1), and Education Code section 89542.5, subdivision (a)(4), does not support PERB's interpretation. According to PERB, the plain meaning of these statutes "is that an employee, at minimum, has the right to a final decision by an arbitrator on the merits of the particular grievance. [¶] Presumably, the Legislature was fully aware of the grievance procedures in the various MOUs and executive orders when it passed [Senate Bill No.] 1212. If the Legislature intended to incorporate specific aspects of these grievance procedures as part of the statutory floor, it could have done so. Instead, the Legislature in [Senate Bill No.] 1212 established a statutory minimum right to a final decision by an arbitrator (unless a greater benefit is negotiated) and it must be presumed that the Legislature intended as much. A proposal to limit the arbitrator's authority would create a lesser, not a greater, benefit or right than the right to a final decision by an arbitrator. To conclude otherwise would reduce the adoption of the minimum rights concept in [Senate Bill No.] 1212 to an idle act, changing nothing in the area of grievance and arbitration rights."

■ This analysis is fatally flawed. Government Code section 3572.5, subdivision (b)(1), provides in relevant part that Education Code section 89542.5 establishes "a minimum level of benefits or rights, and is superseded by a memorandum of understanding only if the relevant terms of the memorandum of understanding provide more than the minimum level of benefits or rights set forth in that section." By its plain meaning, this language simply establishes the "benefits or rights" of section 89542.5 as a "minimum level," and makes the terms of a memorandum of understanding ineffective to the extent they provide lesser "benefits or rights." This language does not declare what these minimum benefits or rights are. ■ Indeed, because "[t]he words of a statute are to be interpreted in the sense in which they would have been understood at the time of the enactment" (*People v. Cruz* (1996) 13 Cal.4th 764, 775 [55 Cal.Rptr.2d 117, 919 P.2d 731]), it would be anomalous if the 2001 enactment of section 3572.5, subdivision (b)(1), purported to define the terms of section 89542.5, subdivision (a)(4), enacted 25 years earlier in 1976.

■ Even if Government Code section 3572.5, subdivision (b)(1), were relevant to discern the meaning of Education Code section 89542.5, PERB's reasoning would nonetheless be flawed. PERB concluded that the Legislature was aware of the grievance proceedings of prior executive orders and memoranda of understanding. Because the Legislature did not incorporate those procedures into section 3572.5, subdivision (b)(1), PERB inferred that the Legislature intended to preclude them. PERB's inference, however, is contrary to settled standards of statutory construction. When the Legislature is aware of prior practice, but fails to change it in a later statutory enactment, courts infer *not* that the enactment expresses legislative disapproval, but

rather that it expresses legislative *acquiescence*—an acknowledgment that the practice is *consistent* with legislative intent. (*Elk County Water Dist. v. Department of Forestry & Fire Protection* (1997) 53 Cal.App.4th 1, 10 [61 Cal.Rptr.2d 536]; *Horn v. Swoap* (1974) 41 Cal.App.3d 375, 382 [116 Cal.Rptr. 113].) Thus, the Legislature's failure to mention prior grievance procedures in section 3572.5, subdivision (b)(1), to the extent it is relevant at all, suggests implied approval of those procedures.

According to PERB, the conclusion that the parties may restrict the power of the arbitrator "would reduce the adoption of the minimum rights [in section 3572.5, subdivision (b)(1)] to an idle act" because it would change "nothing in the area of grievance and arbitration rights." PERB is incorrect. Before Government Code section 3572.5, subdivision (b)(1), the University had the power to negotiate away the core grievance procedures of Education Code section 89542.5. Those procedures include the right of "all academic employees, including all temporary employees who have been employed for more than one semester or quarter" to the following: a public hearing before a faculty hearing committee (§ 89542.5, subd. (a)(1), (2)); the right to representation and to a complete record of the hearing (§ 89542.5, subd. (a)(3)); the right to arbitration of any disagreement between the decision of the faculty committee and the decision of the campus president (§ 89542.5, subd. (a)(4)); the right to have the University bear the costs of arbitration (§ 89542.5, subd. (a)(5)); and the right to a procedure for selection of a neutral arbitrator (§ 89542.5, subd. (a)(6)).

The "change" worked by section 3572.5, subdivision (b)(1), was to deprive the University of the ability to eliminate these rights through collective bargaining. That change certainly was not an "idle act." And in any event, it is an act that says nothing about the scope of the rights enshrined in section 89542.5—an inquiry that depends on the language of *that* section.

■ Section 89542.5 requires the University to "establish grievance and disciplinary action procedures" for academic employees that include certain listed requirements. Among these, as we have noted, is the requirement that grievances "shall be heard by a faculty hearing committee . . . which shall make a recommendation to the president of the state university" (§ 89542.5, subd. (a)(1)), and that "[i]f there is disagreement between the faculty hearing committee's decision and the state university president's decision, *the matter shall go before an arbitrator whose decision shall be final*." (§ 89542.5, subd. (a)(4), italics added.) The requirement that a dispute be submitted to an arbitrator for a "final" decision does not preclude limits on the scope of review leading to the decision, or on the remedies that may be implemented by the decision.

■ Historically in California, the concept of a final arbitral decision means that the arbitrator's resolution of a claim will be binding on the parties, and will settle the dispute presented without judicial intervention, save for the limited judicial review provided by Code of Civil Procedure section 1280 et seq. (See *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9–10 [10 Cal.Rptr.2d 183, 832 P.2d 899] [agreement to arbitrate presumes that the arbitration award will be conclusive as to the parties, with minimal judicial intervention] (*Moncharsh*); *Cheng-Canindin v. Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676, 687 [57 Cal.Rptr.2d 867] [to constitute an arbitration, a proceeding must require, inter alia, a "final and binding decision"]; *Trollope v. Jeffries* (1976) 55 Cal.App.3d 816, 822–823 [128 Cal.Rptr. 115] [arbitral decision entitled to res judicata effect because it is conclusive as to parties' rights in the dispute they have presented to the arbitrator, subject to limited power of the court to confirm, correct, or vacate]; see also *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749, 759–760 [6 Cal.Rptr.2d 27] [same]; Code Civ. Proc., § 1283.4 [arbitrators' award "shall include a determination of all the questions submitted to the arbitrators the decision of which is necessary in order to determine the controversy"].) Although in this sense an arbitrator's decision is "final," the parties are free to negotiate contract terms that define the arbitrator's powers and limit the available remedies. (*Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 344 [79 Cal.Rptr.2d 308, 965 P.2d 1178]; see also *Moncharsh, supra,* 3 Cal.4th at p. 8.) Nothing in the language of section 89542.5 suggests that by providing for a "final" decision by an arbitrator, the Legislature meant to depart from the common understanding of arbitral finality, and meant to refer only to a decision reached after unfettered review by the arbitrator. PERB's assumption that a final arbitral decision requires unlimited review and unlimited remedies is simply unsupported by the statutory language.

The plain meaning of the statutory language is unambiguous as applied to the instant case, and controls the result. (See *J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1575 [33 Cal.Rptr.2d 206].) The present dispute arose because the University proposes to define the powers of the arbitrator to review a campus president's decision on matters of faculty

appointment, reappointment, promotion or tenure.[7] The proposed limits (1) would permit the arbitrator to overturn the decision for procedural error only if the error was proved by clear and convincing evidence and was prejudicial; (2) would provide that the "normal remedy" for such procedural error is a remand for reevaluation, with the arbitrator having authority to retain jurisdiction; and (3) would restrict the arbitrator's power to grant appointment, reappointment, promotion or tenure to only extreme cases where the campus decision was not based on reasoned judgment, where it was certain that appointment, reappointment, promotion, or tenure would have been granted but for the error, and where no other alternative is practicable.

▪ None of these proposed limits affects the finality of the arbitrator's decision within the meaning of section 89542.5, subdivision (a)(4)—the arbitrator's decision would be binding on the parties, would settle the dispute presented, and would be reached without judicial intervention save limited judicial review. Hence none of these provisions, if incorporated into a memorandum of understanding, would provide a lesser level of rights or benefits than those of section 89542.5.

▪ CFA asserts that by limiting the normal remedy for procedural error to a remand for reconsideration, the University's proposal would not ensure a

---

[7] In relevant part, the University's proposal provided:

"f. The arbitrator's award shall be based solely upon the evidence and arguments appropriately presented by the parties in the hearing and upon any post-hearing briefs.

"g. The arbitrator shall have no authority to add to, subtract from, modify, or amend the provisions of this Agreement.

"h. The authority of an arbitrator with respect to granting appointment, reappointment, promotion, or tenure shall be as follows:

"In cases involving appointment, reappointment, promotion, or tenure, the arbitrator shall recognize the importance of the decision not only to the individual in terms of his/her livelihood, but also the importance of the decision to the institution involved.

"The arbitrator shall not find that an error in procedure will overturn an appointment, reappointment, promotion, or tenure decision on the basis that proper procedure has not been followed unless:

"1) there is clear and convincing evidence of a procedural error; and

"2) that such error was prejudicial to the decision with respect to the grievant.

"The normal remedy for such a procedural error will be to remand the case to the decision level where the error occurred for reevaluation, with the arbitrator having authority in his/her judgment to retain jurisdiction.

"An arbitrator shall not grant appointment, reappointment, promotion or tenure except in extreme cases where it is found that:

"1) the final campus decision was not based on reasoned judgment;

"2) but for that, it can be stated with certainty that appointment, reappointment, promotion, or tenure would have been granted; and

"3) no other alternative except that remedy has been demonstrated by the evidence as a practicable remedy to resolve the issue.

"The arbitrator shall make specific findings in his/her decision as to the foregoing."

"decision [by the arbitrator] shall be *final*." (§ 89542.5, subd. (a)(4), italics added.) According to CFA, a remand would require further proceedings, and possibly renewed arbitration. Perhaps so, but that does not violate the requirement of a final arbitral decision. As here relevant, a " 'grievance' is an allegation by an employee that the employee was directly wronged in connection with the rights accruing to his or her . . . appointment, reappointment, tenure, promotion, reassignment, or the like." (§ 89542.5, subd. (b).) If the allegation were that the employee was directly wronged by a procedural error that led to the president's disagreement with the faculty committee's recommendation, an arbitral resolution finding procedural error but remanding for error-free reconsideration is a binding resolution of the particular claim made. It is thus "final" as the term is generally understood in the arbitration context. Moreover, that an additional arbitration proceeding may occur does not mean that no "final" arbitral decision will be reached consistent with section 89542.5, subdivision (a)(4). The "principle of arbitral finality . . . does not preclude the arbitrator from making a *final* disposition of a submitted matter in more than one award." (*Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1433 [104 Cal.Rptr.2d 209].)

CFA erroneously contends that the University's proposal would permit review only of procedural errors, not the substance of the president's decision. Thus, according to CFA, the proposal fails to meet the mandate of section 89542.5, subdivision (a)(4), that "the matter"—in CFA's view, meaning the procedure *and* the merits of the president's decision—be submitted to arbitration. However, the University's proposal contemplates review of both procedure and substance. Under the University's proposal, the arbitrator's award must be "based solely upon the evidence and arguments appropriately presented by the parties in the hearing and upon any post-hearing briefs." (See fn. 7, *ante*.)

Besides the provision governing procedural error, the proposal states that the arbitrator may grant appointment, reappointment, promotion or tenure, when (1) the president's decision "was not based on reasoned judgment"; (2) "but for that [failure of reasoned judgment], it can be stated with certainty that appointment, reappointment, promotion, or tenure would have been granted"; and (3) "no other alternative except that remedy has been demonstrated by the evidence as a practicable remedy available to resolve the issue."

By requiring that the arbitrator's decision be based on the evidence and arguments, and by permitting the arbitrator to determine whether the president's decision was supported by "reasoned judgment," the University's proposal necessarily contemplates that the arbitrator would be empowered to examine the substance of the president's decision, albeit under a deferential

standard of review. Further, if the arbitrator concluded that the president's judgment was not reasoned, the arbitrator would be able to set aside the president's decision under the limited conditions specified—certainty that appointment, reappointment, tenure, or promotion would otherwise have been granted; and the impracticability of any other remedy. Thus, CFA is incorrect in asserting that the University's proposal would prevent the arbitrator from examining the merits of the president's decision.

In short, we find nothing in the plain meaning of the statutory language to support PERB's decision. On that basis alone, PERB's statutory interpretation is clearly erroneous. Nonetheless, because PERB reached the issue, we also consider the relevant legislative history. That, too, fails to support PERB's construction.

*Legislative History*

PERB looked exclusively to the legislative history of Senate Bill No. 1212 (2001–2002 Reg. Sess.), which as enacted became section 3572.5, subdivision (b)(1). PERB concluded that "[t]he dominant thread that runs throughout the legislative history is that SB 1212 was intended to establish that the law relative to grievance and disciplinary actions was a statutory 'floor,' and that these rights (in particular, Education Code section 89542.5, which mandates that the arbitrator's decision 'shall be final') 'cannot be eliminated or reduced through collective bargaining.' "

Although PERB accurately describes the legislative history of Senate Bill No. 1212 (2001–2002 Reg. Sess.), that history has nothing to do with defining the rights set forth in section 89542.5. In passing Senate Bill No. 1212, the Legislature did not purport to characterize the meaning of a "final" arbitral decision (§ 89542.5, subd. (a)(4)). Even if it had, the validity of such a retroactive characterization would be questionable at best. (See *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 [276 Cal.Rptr. 114, 801 P.2d 357] ["The declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law"].) In short, the legislative history of Senate Bill No. 1212 shows that the Legislature intended to establish the grievance procedures of section 89542.5 as minimum rights—but it shows nothing more. If legislative history must be examined to determine the meaning of a "final" arbitral decision, it is the history of section 89542.5 that is controlling.

When section 89542.5 was under consideration as Assembly Bill No. 804 (1975–1976 Reg. Sess.) in 1975, the Legislature was aware of the University's Executive Order No. No. 201, which provided for final and binding arbitration, but which also set forth substantial limits to the arbitrator's authority. Throughout the legislative history there are references to Executive Order No. 201 and existing grievance procedures. For instance, Assembly Bill No. 804 was first referred to the Assembly Committee on Public Employees and Retirement, whose report on the bill referred to the arbitration procedures of Executive Order No. 201, and stated that Assembly Bill No. 804 established an alternative procedure to current law. The Senate Committee on Education reported that in June 1974 the University "issued Executive Order No. 201, a comprehensive grievance policy for academic employees. The procedure has substantial similarities to that proposed in this measure." The education committee included a copy of Executive Order No. 201 with its report.

The Legislative Analyst's report on Assembly Bill No. 804 (1975–1976 Reg. Sess.) described the differences between "current grievance procedures" (i.e., Executive Order No. 201) and those of Assembly Bill No. 804. The listed differences were that the bill included part-time and temporary employees, deleted a grievance committee's authority to screen out grievances, provided access to a tape recording of the hearing, and ensured a right to representation. The differences did *not* include any reference to the meaning of a "final" arbitral decision, thus suggesting that nothing in the procedure of Executive Order No. 201, including limits on the power of the arbitrator, was inconsistent with Assembly Bill No. 804. Moreover, an amended version of the bill adopted verbatim certain provisions in Executive Order No. 201, including the definition of the word "grievance."

Thus, the clear inference from the legislative history of Assembly Bill No. 804 (1975–1976 Reg. Sess.) is that by providing for a "final" arbitral decision in section 89542.5, subdivision (a)(4), the Legislature did not intend to provide for unlimited arbitral review. To the contrary, the Legislature knew of the restrictions on arbitral review contained in Executive Order No. 201, and found nothing in them inconsistent with Assembly Bill No. 804. Like the plain meaning of the statutory language, the relevant legislative history leaves no doubt that PERB's statutory interpretation is incorrect.[8]

---

[8] Because we find the plain meaning of the statutes and the relevant legislative history sufficient to overturn PERB's decision, we do not discuss the University's other arguments for reversing PERB's statutory interpretation.

## DISPOSITION

Let a writ of mandate issue directing PERB to vacate its decision sustaining CFA's unfair labor practice charge, and to enter a new and different order denying that charge.

Manella, J., and Suzukawa, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied December 12, 2007, S157954. Werdegar, J., did not participate therein.